90 So.2d 828

**JAMES A. HEAD & COMPANY, Inc.**

v.

**Fred ROLLING et al.**

6 Div. 954.

Supreme Court of Alabama.

Sept. 13, 1956.

Rehearing Denied Nov. 29, 1956.

Lange, Simpson, Robinson & Somerville, Reid B. Barnes, Jas. A. Simpson and Dan J. Meador, Birmingham, for appellant.

Lucien D. Gardner, Leigh M. Clark, J. Asa Rountree, III, and Cabaniss & Johnston, Birmingham, for appellees.

**334**

MERRILL, Justice.

James A. Head & Company, Inc., a corporation in Birmingham, hereinafter referred to as "Head," is and has been engaged in the office supply business. The president of the Company, James A. Head, is the majority stockholder in the corporation and is practically the alter ego of the corporation.

Carl Bryson, Bob Bodine and Fred Rolling had been employees of the company for various periods of time; Bryson since 1926, Bodine since 1936 and Rolling since 1946. The first two named were directors of the corporation until 1952.

The company's sales were of two types. Ordinary or commercial sales were made to individuals who desired office equipment or supplies, and "contract" sales were made to schools, churches, hospitals and institutions, where large orders of equipment were installed. Bryson and Rolling were employed to make and service "contract" sales, while Bodine's sales were of the commercial type.

Prior to August 1, 1949, Bryson and Rolling became dissatisfied with the terms under which they were employed, and were contemplating severing their relations with the company. Negotiations ensued between them and Mr. Head, which resulted in a new contract of employment. This contract was never reduced to writing and signed by the parties, but Mr. Francis Latady, an attorney and Head's accountant and financial adviser, who sat in on the negotiations, prepared a draft of a contract which contained most of the things agreed upon, but it was not totally satisfactory to any of the parties, and was never signed. This draft is referred to by the parties as the "Latady Draft." The essence of the contract was that Bryson, Rolling and the company would each receive one-third of the net profits of a new department which would be known as the "contract department" and that Bryson and Rolling were to manage this department. The net profits were to be arrived at by deducting $9,000 each year for certain itemized expenses, plus all direct expenses.

Mr. Head became dissatisfied with this new agreement, because Bryson and Rolling began making a large amount of commercial or ordinary sales, which Head contends were outside the scope of the "contract" department, and Head felt their compensation was too large and their "commercial" sales worked to his disadvantage.

Mr. Head notified both Rolling and Bryson on October 30, 1951 that the contract of employment would be terminated as of December 31, 1951, but that he would like to enter negotiations for a new contract with them. These negotiations proved futile and Rolling and Bryson both submitted their resignations on December 14 and 15, 1951, effective on December 31 of that year. Bodine submitted his resignation on December 16, 1951, also effective on December 31 of that year.

On January 2, 1952, a partnership was formed by the three former employees under the name of Bodine-Bryson & Rolling to engage in the office supply business. One Mrs. Pace, who had been Bryson's secretary, resigned on December 31, 1951 and went with the new partnership. Eventually, 9 former Head employees came to work with the new business.

Immediately upon forming the partnership, Bryson and Rolling began the aggressive solicitation of certain suppliers of lines of merchandise for which Head had been the exclusive dealer. A total of seventeen of these manufacturers eventually terminated their dealership contracts with Head and made new ones with the partnership.

In March and April 1952, Bryson and Rolling began demanding settlement from Head for their share of the profits on business done under their agreement. Head refused to make any settlement and on August 26, 1952, Bryson sued James A. Head & Company, claiming $66,368.25 in a complaint embodying the common counts and a count based on alleged breach of an oral contract. Rolling filed a like suit for $66,836.66 on the same day. On motion of the company, these cases were transferred to the equity side of the court and, as required by the case of Cornelius v. Moore, 208 Ala. 237, 94 So. 57, Head filed its bill of complaint and has since been treated as the complainant.

The tenor and gist of these bills of complaint was that during the period of their employment by complainant and/or immediately after its termination respondents Rolling and Bryson solicited and induced a large number of manufacturers, then selling their products through complainant, to cancel these existing relationships with complainant and to transfer their agencies to respondents or to a partnership called Bodine-Bryson & Rolling, which had been organized by respondents in association with J. R. Bodine (likewise an employee of complainant) to carry on the same type of business as that engaged in by the complainant. They also employed several experienced and trained employees from complainant's organization and began business as of January 2, 1952, and within weeks had twenty-two manufacturers agencies, seventeen of which were with complainant as of December 31 previously and with eleven personnel, including the three partners, nine of whom came out of complainant's organization. The complainant prayed appropriate relief for the breach of the fiduciary duty of respondents not to interfere with the existing relationships between complainant and said manufacturers.

Respondents filed answers and cross bills; the general effect of the answers was to deny all charges of any breach of fiduciary relationship. They admitted that subsequent to December 31, 1951, seventeen manufacturers and producers had transferred their representation from complainant to respondents, but that such action was free and voluntary and occurred without any illegal, inequitable or improper inducement, enticement or coercion on the part of respondents; also that former employees of the company were working for them, but denied that such action was the result of any improper conduct on the part of respondents or anyone acting in their behalf. The effect of the cross bill was to set up the cause of action contained in their suit at law and prayed for an accounting of the amounts due them as employees of complainant.

The two cases were consolidated for trial and after lengthy hearings, the trial court on March 14, 1955, entered a decree

finding the issues in favor of the respondents, "except with respect to such damages as may have been caused by the removal from its premises of certain books and papers," and except that complainant was entitled "to an accounting for certain sales made by respondent partnership to Alabama Educational Foundation."

This decree was entered on the last day that Judge Eugene H. Hawkins was in office, he having resigned, effective the following day. The complainant filed an application for rehearing which was presented to the court, with the Hon. Frank B. Embry presiding. The court entered a decree denying jurisdiction of the application for rehearing, on the grounds that it had not been duly continued to a day certain, and also because under equity rule 62, Code 1940, Tit. 7, Appendix, an application for rehearing must be presented "to the judge who rendered the decree."

 The complainant then appealed from the final decree of March 14, 1955 and also from the decree denying jurisdiction of the application for rehearing. The appellees moved to dismiss that part of the appeal taken from the decree declining to consider the application for rehearing. This motion is granted. On appeal this court will not review the action of the lower court in declining to consider a motion for a new trial or an application for a rehearing. See Baggett Transp. Co., Inc., v. Avery Freight Lines, Inc., 256 Ala. 615, 56 So.2d 669; Hurt v. Knox, 220 Ala. 448, 126 So. 110; Western Ry. of Alabama v. Wallace, 170 Ala. 584, 43 So. 533. And even if the court had considered the application and merely entered a decree overruling it, no appeal would lie from such decree, and it cannot be made the basis of an assignment of error. See McNeil v. Hadden, 261 Ala. 691, 76 So.2d 160; Whitman v. Whitman, 253 Ala. 643, 46 So.2d 422; Rudolph v. Rudolph, 251 Ala. 317, 36 So. 2d 902; Spurling v. Spurling, 250 Ala. 612, 35 So.2d 502. Moreover, the court had lost jurisdiction of the decree. Title 13, § 119, Code 1940. But we do not agree that

a party can be denied a rehearing in the circuit court because of the inability of the applicant to present the application "to the judge who rendered the decree." We would be compelled to construe the words trial "judge" and trial "court" as being synonymous when it is impossible to present the application to the judge who rendered the decree. Russell v. Sunburst Refining Co., 83 Mont. 452, 272 P. 998. See Faust v. Faust, 251 Ala. 60, 36 So.2d 229; Chambless v. Black, 250 Ala. 604, 35 So.2d 348. However, as already noted, the other ground on which the application was refused was well taken.

The record in these consolidated cases comprises over 2,500 pages; the appellant's briefs consist of 299 pages and appellees' briefs of 270 pages. There are 107 assignments of error in one case, 106 in the other. We consider applicable what was said in Shepherd v. Sartain, 185 Ala. 439, 64 So. 57, 65: "To assert that we have compassed the enormous task here imposed upon us, involving as it does innumerable questions of fact as well as of law, without mistake more or less numerous, would be an unbecoming assumption of judicial infallibility. That we have reached an approximately correct result we have, however, no reason for seriously doubting."

 Argument in brief is assigned to 106 assignments of error in one case and to 105 in the other, but they can be divided into 7 groups for discussion. The first group is concerned with the finding of the court that the contract between the parties was the "Latady Draft." When Head and respondents were negotiating in 1949, Latady sat in on the conferences and he drafted his conception of the agreement which is called the "Latady Draft" and which will be set out by the reporter. Latady gave a copy of this draft to respondents, and a letter is in evidence showing that he had sent a copy to Mr. Head, but Mr. Head testified that he had never seen the draft prior to the trial. The draft was never signed by the parties. The chief

conflict in the case is over the terms of the contract the parties actually had between August 1, 1949 and December 31, 1951. Certain it is that they operated under some agreement. No parties were exactly satisfied with the "Latady Draft" but all parties were following it in principle, and the trial court found it to be the contract, subject to a subsequent modification which had been made by mutual agreement. The court resolved the conflicting testimony in favor of the "Latady Draft" and we are not disposed to say that reversible error was committed in so doing.

■ The next group of assignments of error are concerned with the construction of this contract. First, were net profits to be computed before or after computation of income taxes? Head contended for the latter course—the respondents for the former. The court decided in favor of respondents. Probably the predominant evidence to the trial court, and certainly to us, is the fact that the income tax returns of James A. Head & Company during the period, prepared by Mr. Latady and signed by Mr. Head, were computed on a profits before taxes basis.

Secondly, it is argued that respondents were to make only such commercial or ordinary sales as were necessary to supply their contracts. According to Mr. Latady, the commercial sales in the contract department in 1949 were $80,000, in 1950 were $347,000 and in 1951 were $426,000. It is understandable that Head did not want to continue an agreement whereby Bryson and Rolling were each receiving one-third of the profits and the company was receiving one-third, when it had a commercial department separate from the contract department to make commercial sales. However, the sales by the commercial department increased from $791,000 in 1950 to $1,089,000 in 1952. Thus the question was not lack of profitable business, but to whom the profits were going. It seems apparent that there was no question by Head about the commercial sales in the contract department until after the outbreak of the Korean

conflict, when items in the commercial department were prorated by the suppliers, and both the commercial and the contract departments could sell more than they could supply. However, it is undisputed that the contract department did not make any sales to customers assigned to the commercial department and its salesmen.

■ The trial court held that the respondents had the right to make these commercial sales under the "Latady Draft." The second sentence of that draft is in pertinent part: "The gross business of the contract Department consists of the sales made by James A. Head & Company, Inc., including contracts, resulting from orders negotiated by C. W. Bryson and/or Fred Rolling, on or after August 1, 1949," seems clearly to support the finding of the trial court, irrespective of the great weight of the testimony that such was the interpretation of the parties.

Thirdly, it is insisted that the court erred in decreeing that "the gross business of the contract department included all sales and contracts resulting from orders negotiated while the contract was in effect, whether completed before or after its termination." Appellant strenuously urges that respondents are entitled to share in no profits accruing after December 31, 1951, the date of the termination of respondents' employment.

It is conceded that appellant's system of accounting of profit and loss in the contract department was the "completed contracts" method. In other words, the profit was not determined until the contract had been completed. Respondents insist that they negotiated and secured many contracts prior to December 31, 1951 which were in various stages of fulfillment on that date. They show that they offered, in writing, to supervise the completion of these contracts in the usual manner after December 31, 1951. Head refused this offer. The trial court found that:

"(d) Respondent and cross-complainant Rolling (Bryson in the other

case) is entitled to have included in the net profits of the contract department, in which he is entitled to share, profits arising from

(1) contracts completed and paid for prior to December 31, 1951, and

(2) contracts negotiated but under which material had not been delivered, serviced or installed as of December 31, 1951, and

(3) contracts negotiated prior to December 31, 1951, and in part only performed and serviced as of that date, and which have been completed by complainant and cross-respondent since that date, and

(4) contracts negotiated prior to December 31, 1951, which as of the date of trial have not been completed, serviced or collected for and are in course of completion, performance or collection, and

(5) contracts which are subject to renegotiation."

No Alabama case is cited, nor have we found one of ours which is decisive of the question of the right of a person employed on a commission or profit sharing basis to participate in profits or receive commissions after the termination of his employment. The case of Oates v. Lee, 222 Ala. 506, 133 So. 44, 45, cited by appellant, is not in point. There the plaintiff was an automobile salesman on commission. He sold a car on October 4, was discharged on October 14 and the car was delivered and paid for the next day. He sued for his commission. This court said these facts made "out a very plain case for recovery," but the plaintiff had signed a contract that he would not be entitled to any commissions for sales not completed and full deliveries made if he had resigned or been discharged. Quoting from another case the court said:

" 'We do not understand why parties in their right mind should enter into such contracts; but these parties did, the court has no authority to make a contract for them, and the contract, lawful in its provisions though it may be considered improvident on the part of plaintiff, must be given effect, if at all, according to its plain and inescapable meaning.' "

■ The general rule in cases presenting questions similar to the one before us seems to be that where the contract provides that the employee will be paid commissions, or share the profits on sales and contracts procured by him, he is entitled to the agreed compensation on those orders which he procured or negotiated, even though his services were terminated before the contract or sale is completed by performance, unless he is precluded by the express terms of the contract. That brings us back to the contract between the parties. In 65 A.L.R. 993 the annotator says:

"The question of the right of a person employed under a contract providing for commissions based upon amounts collected, to commissions on collections made after termination of the employment or discharge for cause, where the collections arise out of business secured during the term, is almost entirely dependent upon the wording of the particular contract involved and the construction to be given thereto."

When we look at the "Latady Draft" we find no provision expressly covering the compensation, if any, on contracts which were procured by respondents before the date of termination but completed afterward. But there are two persuasive indications that they were to share in the profits on such contracts. First, the profits in which respondents would share were sales and contracts made by their department on or *after* August 1, 1949. These sales and contracts were made and procured after that date and were in various stages of completion when respondents' employment was terminated. It should be noted here that there is no question about

Head's right to terminate the contract, and no dereliction of duty or improper conduct by respondents caused the termination. Secondly, the next to last paragraph of the "Latady Draft" recognizes that respondents had been operating the contract department previously, but *no* sales or completed contracts made by them prior to August 1, 1949 would be included in the contract, but would be the business of Head, except the Mississippi State College contract, although respondents were required to complete such contracts. Thus, work done prior to August 1, 1949 but to be completed afterward, was specifically excluded. It would seem that a provision specifically excluding any profits in contracts completed after termination would have been called for had such been the intention of the parties. They could have inserted a provision similar to that in Oates v. Lee, supra, but they did not. Appellants argue that the contract does not provide for computation of future profits because the contract says that "on December 31, 1949 and at the close of each annual accounting period of James A. Head & Company, Inc., thereafter, the net profit of the Contract Department shall be determined * * *." Appellant says that the termination as of December 31, 1951 terminated all of respondents' claims to any profits on any contracts not completed as of that date. It seems to us that the reference to the annual accounting period is a reference to the *time* in each year when profits will be computed, and that it does not signify a termination date. Appellant further contends that: "There being no express provision for an allowance of compensation on the basis of future profits, the contract cannot be logically interpreted to afford such a basis; such profits necessarily accruing only upon and after extended services which are never performed by Bryson or Rolling (because of the termination of the contract) and which services must necessarily be performed by others in order to produce the profits." A reply to that contention is that it is undisputed that respondents offered to service the uncompleted sales and contracts but their offer was refused. Moreover, unless there are profits, there is nothing in which respondents can hope to share. We think the contract itself was sufficient to support the finding of the trial court.

But if it be conceded that the "Latady Draft" is ambiguous on the matter, there are other circumstances which tend to show that the parties did not consider December 31, 1951 as the termination date of all compensation due respondents from Head. In its motion to transfer the cause from law to equity, verified by James A. Head, on March 10, 1953, complainant stated:

"Defendant further shows the Court that whether the Court determines the foregoing issues favorably to the contention of the plaintiff or to the defendant there will, based on such determination, then arise a complicated and difficult accounting, which will involve a mutual accounting of claims asserted by each of the parties. In determining the result of the handling of a given contract, it will be necessary to charge as a cost in the performance of said contract, the following items asserted by plaintiff, viz:

"Cost of the material, cost of labor for installation, cost of transportation, cost of telegrams, telephone messages, etc., with respect to the job, etc. etc., and items asserted by the defendant such as costs borne by the defendant after December 31, 1951, viz;

"Costs for installation, supervision of installation, the handling of complaints, replacing defective material, correcting failure of plaintiff to make proper investigation before entering order, allowance of chargebacks, settlement of over-all claims for defective material, and uncollectible or uncollected installments of purchase price.

"Defendant further avers that it is in truth and in fact impossible to present such an accounting to a jury within the rules and limitations of a trial

at law before a jury. In order to determine what has become net profit or loss on the items mutually asserted as credits or deductions therefrom can only be determined in an orderly way by an accounting in Equity.

"Defendant shows the Court that "net profit" as claimed by plaintiff can only be determined after the completion of the work involved in earning said net profit, the determination and payment of expense and costs incurred, and the collection of the consideration to be received."

These statements seem to show that James A. Head knew and believed certain sums were due respondents on uncompleted contracts and that a proper accounting could only be had in equity.

■ Another circumstance showing the mind of the parties is that on April 12, 1952, Rolling wrote the company requesting among other things, remittance of the amount due him for sales and contracts completed in January, February and March, 1952. Appellant replied by writing separate letters to both respondents on May 12, 1952 in which, while denying the existence of a contract, and especially the "Latady Draft," liability was admitted for services rendered, and proposed a basis for payment of compensation on sales and contracts negotiated by them prior to December 31, 1951, but which were completed after that date. We conclude that the trial court was not in error in its decree (d) (1)–(5) supra. Cases supportive of this conclusion are:

Sooner Broadcasting Co. v. Grotkop, Okl., 280 P.2d 457;

Prochniak v. Wisconsin Screw Co., 265 Wis. 541, 61 N.W.2d 882;

Barilleau v. Paquet, La.App., 159 So. 418;

Braun v. Consolidated Electric Lamp Co., 245 Wis. 170, 13 N.W.2d 549;

Singer Sewing Machine Co. v. Brewer, 78 Ark. 202, 93 S.W. 755;

Ohio Marble Co. v. Byrd, 6 Cir., 65 F. 2d 98;

Galperin v. Michelson, 301 Mich. 491, 3 N.W.2d 854.

■ Appellant attacks the "formula" which the court, in paragraph 6 of the decree, ordered the register to use in determining the profits on sales. True, the "Latady Draft" does not provide specifically for an event such as is here presented; but appellant asked for an accounting and offered to do equity, and the "formula" proposed by the trial court seems equitable under the circumstances. Moreover, while appellant criticizes the court's "formula", no better one is suggested as a substitute.

Next we come to appellant's contention that respondents breached a fiduciary duty in employing certain employees of Head. While several such people eventually were hired by respondents, the charge of complainant stands or falls on the cases of two employees, Mrs. Pace and one Schuelly.

■ Mrs. Pace had been Bryson's secretary in the contract department. She testified that respondents called her in Bryson's office about the middle of December 1951 and dictated their resignations effective December 31st. She asked Bryson if she could go with him wherever he went to work, and he told her he would make a place for her. She resigned on December 31st and went with the partnership when it was formed. She emphatically testified that the proposal to go with Bryson came from her, and that they did not discuss salary or anything else other than Bryson would make a place for her. The very statement of the facts is sufficient to show that there was no breach of a fiduciary relationship as between any of the parties connected with the matter, and the Pace incident avails complainant nothing. Appellant states in brief "we do not contend that the mere discussion of their future by respondents after they had resigned and before they left would be disloyal."

■ Schuelly had originally lived in Long Island, N. Y. While installing labo-

ratory equipment for Kewaunee Manufacturing Co. at Auburn, which had been sold by Head through Rolling, he met Rolling and later Bryson. They offered him a job and he moved to Alabama. He had worked for the Company for more than a year before he met Mr. Head. Schuelly testified that about Christmas Rolling told him he was leaving Head and he did not know what he was going to do; that after Rolling left, he (Schuelly) talked with Rolling about going with him and was told he could do so after he completed his work with Head. Appellant would have no basis for argument except that Bryson testified that as he remembered it, they told Schuelly during the last half of December 1951, that they were leaving and would like for him to come with them and that Schuelly said he would like to work for them. There was no talk of the amount of salary or working conditions. Actually, Schuelly continued working for Head for about a year before he went with the respondents. We do not think that the Schuelly incident merits an overturning of the court's finding that "Prior to said date (Jan. 1, 1952) said respondents did not conceive a plan of enticing away from complainant any of its employees, and did not solicit, entice or induce any employee of complainant to leave its employ and did not improperly, illegally or inequitably cause any employee of complainant to leave its employ."

We come now to the point on which most stress is laid. That is the contention by appellant that respondents breached their fiduciary duty to it by soliciting and acquiring lines of seventeen of the manufacturers and suppliers.

The law on this subject has been stated variously by many courts. A very good statement appears in one of our cases, which is not cited by either party. In Scottish Union & National Insurance Co. v. Dangaix, 103 Ala. 388, 15 So. 956, 958, this court said:

"It is a principle of universal prevalence, that an agent must not put himself, *during the agency*, in a position which is adverse to that of his principle. 1 Pars.Cont., p. 93. This rule can not, perhaps, be more comprehensively and concisely stated, than as we find it in the American notes to Keech v. Sandford, 1 White & T. Lead.Cas.Eq. 53: 'Wherever one person is placed in such relation to another, by the act or consent of that other, or the act of a third person, or of the law, that he becomes interested for him, or interested with him, in any subject of property or business, he is prohibited from acquiring rights in that subject, antagonistic to the person with whose interests he has become associated.' Davis v. Hamlin, 108 Ill. [39] 40. We have been unable to find any decided case, or to find the principle asserted in any text-book on agency, which lays down the proposition, that one who has acted as an agent of another, whose agency has terminated, may not, thereafter, if he act in good faith and without fraud, engage in business in competition with, and even to the injury of his former principal. The law has not attempted to prescribe rules for the conduct of one who leaves the service of his first employer and enters that of another. The only restraint the law lays on the retiring agent is, that he must tell the truth when he speaks of his former employer and his business, and shall be guilty of no fraud or deceit at his expense, for the profit of himself or another. If he does, he is personally responsible for the damage he causes. An insurance agency is a profitable and useful business employment. A good and capable agent of the kind often controls a large patronage and enjoys a valuable good will which he may use or sell. If he should cease to represent one company, and engage to represent another, to the great disadvantage of the first, there is no law to prevent his doing so. Every one who employs an agent does so with the certain knowledge that his agency may

terminate at any time, except in so far as it is restrained by contract, and that the agent may transfer himself, with all his information, skill and patronage, to another rival in business, or set up on his own account, in a competing line. Such persons are hired, often, in consideration of the trade that follows them, and this is legitimate, to the extent that it is fairly influenced."

See 3 C.J.S., Agency, § 146. There are many "customer," "milk wagon" and "laundry" cases where the courts have held invariably that a route man could win the customers of his former employer after termination of his employment. As expressed in Boone v. Krieg, 156 Minn. 83, 194 N.W. 92:

"The case is the ordinary one where an employé leaves his employment to better himself, engages in a like business, and seeks the patronage of his former employer's customers. Such conduct may seem unfair to the employer. The employé may conduct his new business in a way that is vexing. In the ordinary case, however, such conduct is not cognizable by the law as the basis for an injunction. No fraud was practiced. No misrepresentations were made. It was merely competition to which the plaintiff must submit. From the standpoint of an employer, it may seem unjust that a faithful employé for a number of years, who has learned the business and become almost a part of it, shall leave and engage for himself in a competitive business; but the employer has no right to his continuance in service, no right to control his activities, no just objection that he engage competitively in a like business and make a career for himself, nor a right to the continued patronage of former patrons. The employé has as much right to start a new business and endeavor to establish it as had his employer to start his business which has become established."

Appellant insists that those cases are inapplicable to the instant case where it was suppliers instead of customers who were solicited. Neither party to this cause has cited a supplier case to us. We think the same law should be applicable whether the case be that of a "customer" or a "supplier." See Duke Bar Journal Vol. 4, Winter 1954, for article entitled "Termination of the Fiduciary Duty of Business Associates Not to Compete For The Firm's Customers and Suppliers."

This court has long recognized the relationship of an agent to his principal as a fiduciary one. See Webb v. Webb, 250 Ala. 194, 33 So.2d 909; Myers v. Ellison, 249 Ala. 367, 31 So.2d 353; Lauderdale v. Peace Baptist Church, 246 Ala. 178, 19 So.2d 538; Peters Mineral Land Co. v. Hooper, 208 Ala. 324, 94 So. 606; Enslen v. Allen, 160 Ala. 529, 49 So. 430.

The instant case does not come within the category of "trade secret" or "breach of trust" or "violation of confidence" cases as exemplified by Fairchild Engine & Airplane Corp. v. Cox, Sup., 50 N.Y.S.2d 643; Aronson v. Orlov, 228 Mass. 1, 116 N.E. 951; Julius Hyman & Co. v. Velsicol Corp., 123 Colo. 563, 233 P.2d 977; Trice v. Comstock, 8 Cir., 121 F. 620, 61 L.R.A. 176; State ex rel. Duggan v. Kirkwood, 357 Mo. 325, 208 S.W.2d 257, 2 A.L.R.2d 216; Byrne v. Barrett, 268 N.Y. 191, 197 N.E. 217, 100 A.L.R. 680.

We think the trial court's finding that there was no breach of fiduciary duty is supported, inter alia, by the principles enunciated in these cases:

Di Angeles v. Scauzillo, 287 Mass. 291, 191 N.E. 426, 93 A.L.R. 1318;

Garst v. Scott, 114 Kan. 676, 220 P. 277, 34 A.L.R. 395;

Padover v. Axelson, 268 Mass. 148, 167 N.E. 301;

Progress Laundry Co. v. Hamilton, 208 Ky. 348, 270 S.W. 834;

City Ice & Cold Storage Co. v. Kinnee, 140 Wash. 381, 249 P. 782; See Restatement, Agency, § 393 Comment (e) and annotation, 126 A.L.R. 758.

We do not find any evidence in the record where any one of the seventeen suppliers who changed their dealership from Head to the respondents was solicited by the respondents to do so prior to Jan. 1, 1952. It is undisputed that each supplier had the right to cancel their agreement with Head and each did so before transferring their line to respondents. There was nothing confidential in their relationship with James A. Head & Company. Other suppliers, other dealers and competitors knew the lines Head carried, and the general public had access to the same information because Head advertised that he was the dealer in such lines. Representatives of several suppliers who left Head testified that there was no solicitation of their representation by respondents until after January 1, 1952. We think both the law and the facts sustain the finding of the court that there was no illegal or improper conduct on the part of respondents in soliciting and securing these agencies.

Appellant lays much stress upon two letters which were written by Bryson prior to December 31, 1951. On October 22, 1951, Heywood-Wakefield Company, a school furniture supplier, wrote Bryson that Head had sold to schools in only six of Alabama's sixty-seven counties and they "would appreciate hearing from you giving us your view on this matter and particularly the reasons for the unsold portion of your territory." Before Bryson had replied to this letter, Mr. Head wrote his letter to Bryson on October 30th terminating his employment as of December 31, 1951. On December 15th Bryson sent in his resignation and on December 17th he wrote Heywood-Wakefield as follows:

"Dear Ed: Territories
This is a rather belated reply to your letter of October 22nd, in connection with the above subject.
After January 1, 1952, I will be in a better position to answer the questions raised in your letter, regarding distribution of Heywood-Wakefield products in Alabama."

Appellant says in brief: "Mr. Bryson's discussions after January 1st would not be for James A. Head and Company; he knew that he would be about his own business whatever form it might take and that what he said thereafter would be said not in the interest of James A. Head and Company. He nevertheless promised that after January 1st he would talk to him ' * * * *regarding distribution of Heywood-Wakefield products in Alabama.'* It would seem too clear for argument that his act in this respect was as disloyal as if he had deliberately stolen cash from the till or in any other manner set about undermining the interests of his employer." We cannot follow this argument. It would be difficult to answer the letter under any circumstances because Heywood-Wakefield was not satisfied with the sales Head was making. From October 30, Bryson knew the contract department was in a state of uncertainty. Unless he could make a new agreement with Mr. Head, his employment terminated. He could not say the sales would increase because he did not know whether he or Rolling would be there to push them. He did not know what the policy would be after he was gone. If he had written that the fault was Head's, or that he was going to leave Head, he would much more have been subject to a charge of disloyalty. But he knew as of December 15 he would not remain with Head and his reply of the 17th, while equivocal, was not calculated to do any harm to Head and left the matter in status quo until Head's new contract department could decide on a policy and an answer. It is interesting to note in passing that Heywood-Wakefield was not one of the seventeen suppliers who left Head.

The other letter was written by Bryson to Holcomb & Hoke Manufacturing Company. This company wrote Head on October 19th suggesting that dealers for their product "Foldoors" be established in six cities in Alabama. On December 17, 1951

**344**

Bryson replied, the body of the letter being as follows:

"Gentlemen: Dealers

Please pardon the delay in replying to your letter of October 19th in connection with the setting up of dealers in our territory.

After January 1, 1952, I will be in a better position to reply to your letter more in detail."

What we said about the Heywood-Wakefield letter is also applicable to this one. It is also noteworthy that on February 7, 1952, Mr. Head wrote Holcomb & Hoke that his company could not spend the necessary time to promote "Foldoor" sales and he would like to discontinue the line, and then Mr. Head suggested Bryson as the new dealer. Thus we see that these two letters which are so severely criticized, concerned two lines, which as stated by appellee, "one of them complainant did not want, and the other the respondents would not have." We are not persuaded that these letters are evidence of bad faith on the part of Bryson and this is in line with the conclusion reached by the trial court.

■ As stated previously, the court found against the respondents in three particulars. The first finding reads:

"(k) On January 1, 1952, the respondent Bryson took from the premises of complainant an application form for the renewal of complainant's license as a general contractor for the year 1952, which form was returned to complainant during January 1952. The form was removed inadvertently and not for an improper purpose. Respondent Rolling did not know of or consent to the removal. It was the property of complainant, who was deprived of the form from the time it was removed until its return.

"(1) On January 1, 1952, the respondent Bryson removed from the premises of complainant, the following items; two files containing request for bids and other information upon two jobs to be let at Maxwell Field, Alabama; correspondence pertaining to partitions for Southern Railway Company; correspondence pertaining to gymnasium seating for Fairfield Industrial High School; quotation on vault door for Housing Project, Decatur; letter from Russell Church Supply Company; quotation to bidding contractors on George Washington Carver School; quotation to bidding contractors on Southside Elementary School, and quotation to bidding contractors on Colbert County High School. Some of said files were removed by said respondent for the bona fide purpose of completing the information necessary to submit bids in the name of complainant, with the intention that such bids, if accepted, would be part of complainant's business and in the belief that such action was in the best interest of and unobjectionable to complainant, and others were removed inadvertently. All of said items were returned to complainant on January 9, 1952. Respondent Rolling did not know of or consent to the removal of the items. The items were the property of complainant, who was deprived of them from the time they were removed until their return."

The decree based on this finding reads:

"Complainant James A. Head and Company have and recover of the respondent Carl W. Bryson such damages as were sustained by it as a proximate consequence of having been deprived of the possession, during the periods stated in paragraphs (k) and (1) of Section 3 hereof, of the application form and the files and papers referred to in said paragraphs."

The second finding reads:

"Respondents Rolling and Bryson on January 1, 1952 removed from complainant's premises two price lists of Kewanee Manufacturing Company, in the bona fide belief that as individuals

they were responsible to Kewanee Manufacturing Company for same. Each knew of the removal of the price lists by the other. They delivered said price lists to a representative of Kewanee Manufacturing Company in Birmingham on January 11, 1952. Complainant was entitled to the possession of said price lists until demanded by Kewanee Manufacturing Company, and was deprived of them from the time they were removed until their return to the representative of Kewanee Manufacturing Company."

The decree based on this finding reads:

"Complainant James A. Head and Company have and recover of the respondents Fred Rolling and Carl W. Bryson such damages as were sustained by it as a proximate consequence of having been deprived of the possession, from January 1, 1952 to January 9, 1952 of the two Kewanee Manufacturing Company price lists removed by said respondents."

We concur with these parts of the decree.

The third finding reads:

"After January 1, 1952, the respondent partnership sold to Alabama Educational Foundation various items of merchandise. Complainant by letter dated April 23, 1951, had offered to furnish and equip the buildings which the Foundation then had under construction or proposed to build, upon a cost plus basis stated in the offer. The Foundation accepted so much of the offer as related to furnishings and equipment that are not connected to or become a part of any building, or do not require complicated assembly. This resulted in a contract covering all buildings then under construction or which were then planned for erection. After January 1, 1952, the respondent partnership sold furniture and other items to Alabama Educational Foundation, for furnishing and equipping buildings upon which construction began after January 1, 1952, in the bona fide belief that such sales were not included in the offer above referred to. Said conduct did not constitute a violation of the fiduciary duties owed by said respondents to complainant. Said sales to Alabama Educational Foundation were the only sales, orders or contracts of complainant that were taken over or filled or supplied by any of respondents. Any sales made by said partnership for furnishing and equipping buildings which on December 31, 1951 were constructed or under construction or which the Foundation then proposed to construct, of the type covered by said contract, were sales made under such contract, which contract was negotiated by the contract department of complainant's business prior to December 31, 1951."

The decree based on this finding reads:

"Complainant James A. Head and Company have and recover of the respondents one-third of the net profits of the respondent partnership Bodine-Bryson & Rolling resulting from the sales to Alabama Educational Foundation for furnishing and equipping buildings which on December 31, 1951 were constructed or under construction or which the Foundation then proposed to construct, where the items sold were not connected to or became a part of the building or did not require complicated assembly, computing net profits from such sales by deducting from the gross sales the costs determined in accordance with the terms of the contract effective August 1, 1949 as hereinbefore found by the Court, and any long distance telephone or telegram charges, traveling expenses or license or tax directly incurred in connection with such sales; together with interest at the rate of six per cent per annum upon the amount due at the end of each calendar year on account of all

sales made and for which payment was received during such year."

It is evident that this matter was not contemplated when this suit was filed. In 1951 Rolling had negotiated a contract with the Alabama Educational Foundation to supply those furnishings described in the court's decree in "the buildings which you have under construction, or, which you propose to build at Indian Springs, Alabama." Head supplied these furnishings, and all parties evidently considered the contract closed and completed. Later, in 1952, after the formation of respondents' partnership, they sold the same kind of equipment to the Foundation for another building which had been constructed after January 1, 1952. Mr. Head knew about this latter sale but no question was raised until the trial of the case. At that time, when Mr. Head was testifying, one of his attorneys, Mr. Simpson, alertly recognized that the contract was a continuing one, and that the sale made by respondents was a sale which should have been made by Mr. Head under the original agreement with the Foundation.

 Appellant argues that this was a breach of fiduciary duty, and this "bad faith destroys any claim for other compensation," but we cannot agree. It was a bona fide mistake, but we agree with the trial court it "did not constitute a violation of the fiduciary duties owed by said respondents to complainant." Since the continuing contract had been negotiated by respondents prior to December 31, 1951 and the profits made on such contracts were to be divided two-thirds to respondents and one-third to complainant, it was appropriate for the court to order that complainant be paid one-third of the profits made on the sale by respondents.

We could prolong this opinion with a discussion of other specific claims, the bases of kindred assignments of error, but we deem such action unnecessary. It is obvious that this case presents largely questions of fact. The two main questions were the terms of the contract, if any, and whether respondents breached any fiduciary duty. The trial court made a clear finding that the "Latady Draft" was the contract between the parties and that respondents breached no fiduciary duty owed to complainant. Suffice it to say that we find no portion of the decree of the trier of fact that is so plainly or palpably wrong as to constitute reversible error. The decree of the lower court is therefore due to be affirmed.

Affirmed.

LIVINGSTON, C. J., and LAWSON and STAKELY, JJ., concur.