H. Keith Johnson appeals from a summary judgment entered in favor of Northpointe Apartments in Johnson's action alleging breach of a lease agreement, conversion, and trespass. We reverse and remand.
Almost all the evidence in this action is in sharp dispute. However, viewed in a light most favorable to Johnson, the nonmovant, as our standard of review requires, Andrews v. Alabama Eye Bank, 727 So.2d 62,63 (Ala. 1999), the evidence suggests the following:
In the spring of 1996, Keith Johnson and his wife, Renee, were leasing Apartment 86 from Northpointe Apartments ("Northpointe"), in Saraland, on a month-to-month basis. Their rent had been paid through May 31. On the night of May 19, the Johnsons became involved in a domestic dispute that resulted in the arrest of Keith Johnson. The same night, after the police left with Keith Johnson in custody, Peggy Jacobs, "Northpointe's apartment manager," telephoned Renee Johnson to inquire whether she wanted to continue living in Apartment 86, and to notify her that Northpointe was not going to allow Mr. Johnson to return to the premises.
Renee Johnson told Jacobs that she intended to vacate Apartment 86 as soon as possible. On May 20, Renee Johnson met with Jacobs and signed a "Notice to Vacate" form ("Notice"), giving notice that she intended to vacate the apartment by May 31. However, the lease agreement between Northpointe and the Johnsons *Page 901 
prohibited termination of the lease by "either the Lessor or the Lessee," except upon "thirty (30) days written notice." The agreement further provided that an untimely termination notice by the lessees would result in the assessment of an additional, "prorated" rent payment sufficient to "fulfill the notice period." Nevertheless, in order to allow Renee Johnson to terminate the tenancy on the last day of May, rather than in the middle, or latter part, of June as would have been required by the 30-day notice, and, thus, to avoid the additional, prorated rent payment, Jacobs backdated the notice to May 1, 1996.
Also on May 20, Keith's father, Hayward D. Johnson, secured Keith's release from jail. Hayward Johnson took Keith Johnson to Hayward's house and "put him to bed," because Keith Johnson had been injured in connection with his arrest. Meanwhile, Keith Johnson's sister, Lisa Janes, went to Keith Johnson's apartment "to get him some clothes." While Janes was at the apartment, she spoke with Renee Johnson, who told her that Jacobs had said she would have Keith Johnson arrested if he came back to his apartment. Janes relayed that information to Keith.
Two or three days later, Anthony Sims, a Northpointe employee, entered the Johnsons' apartment to help Renee move a refrigerator to another apartment unit in Northpointe. In addition to moving the refrigerator, Renee moved miscellaneous items of personalty, "such as a TV, microwave, mattresses . . . and clothes belonging to [her] and the kids." Among the items Renee left behind were "the dining room set, living room set, living room TV, desk, dresser, end tables, frames of [childrens'] bunk beds, two dressers . . ., mirrors and Keith's personal property, including his large collection of tools, other personal property and his memorabilia." Affidavit of Renee Johnson.
On May 24, 1996, Jacobs ordered Sims to remove all of Keith's personalty from his apartment, and to place it in the "breezeway" of the apartment complex. At approximately 4:00 p.m., Jacobs telephoned Keith at his father's house and told him that his personal property had been removed from the apartment and placed in the "breezeway," and that if it was not picked up by 5:00 p.m., Northpointe would not be responsible for it. Moreover, she instructed Keith not to come in person, because, she said, he would not be allowed on the premises.
When Hayward arrived at Northpointe a few minutes before 5:00 p.m. to pick up the items, Jacobs presented him with "a couple of garbage sacks" of clothes and assorted items, one three-piece sofa, and a mattress. Hayward then sought to enter Keith's apartment, but Jacobs denied him permission to enter, stating that the apartment was being repainted.[1]
On July 31, 1997, Johnson filed a three-count complaint against Northpointe. Count One alleged breach of contract. Count Two alleged conversion of personal property. County Three alleged trespass. Northpointe moved for a summary judgment. The trial court granted Northpointe's motion, and Johnson appealed. We first consider whether the summary judgment was proper on Johnson's breach-of-contract claim.
 I. BREACH OF CONTRACT
Northpointe contends that the "notice given by Renee Johnson of her intent to vacate Northpointe Apartments was sufficient to bind her husband, a co-lessee on the lease agreement." Brief of Appellee, at 12. This is so, because, it states: "Alabama law has recognized a wife's ability to act on the behalf of her husband to bind him by her actions in situations where it appears that the wife has apparent authority in her dealings with third parties." Id. *Page 902 
Assuming arguendo that Northpointe's statement of Alabama lawis correct; assuming further that there is no factual dispute regarding Renee's apparent authority to terminate the lease by signing the Notice; and even assuming the efficacy of the back-dated Notice to terminate the tenancy under the circumstances of this case, we cannot conclude that Northpointe was entitled to a judgment as a matter of law. "A tenant, having an estate in land, has the general and exclusive right of possession during the term. He may exclude third persons and, with few exceptions, the landlord as well." Roger Cunningham, William Stoebuck, Dale Whitman, The Law ofProperty § 6.22, at 282 (1984).
Johnson contends that Northpointe breached its lease contract "by denying [him] his right of possession of the leased property for eleven days," and, "by interfering with [his] covenant of quiet enjoyment of the leased property. Brief of Appellant, at 9. Indeed, "[t]here is implied in every leasing a covenant of quiet enjoyment. It is both a covenant and a warranty. The landlord warrants that the tenant will not be disturbed in possession by any other person with a superior legal right to possession." Cunningham, Stoebuck, Whitman, supra, at § 6.30, pp. 292-93 (footnote omitted); see also Abrams v. Watson, 59 Ala. 524 (1877). "Moreover, the landlord covenants not to evict the tenant himself, actually or constructively. Thus, the covenant is breached . . . if, during his term, the tenant is disturbed by a third person or by the landlord." Cunningham, Stoebuck, Whitman, supra, at § 6.30, p. 293 (emphasis added). "A breach of the covenant of quiet enjoyment occurs when the landlord substantially interferes with the tenant's beneficial use or enjoyment of the premises." EchoConsulting Servs., Inc. v. North Conway Bank, 140 N.H. 566,669 A.2d 227 (1995) (citing 2 R. Powell, Powell on Real Property ¶ 232[1] (1994)). "Even if not substantial enough to rise to the level of a constructive eviction . . ., such interference may constitute a breach of the covenant of quiet enjoyment entitling the tenant to damages."Id.
Pursuant to the backdated Notice, the Johnsons' tenancy period did not terminate until May 31. Northpointe does not indeed, could not contend that it had a right to interfere with Renee's right of possession before the lease terminated on May 31. This is so because, as we noted earlier in this opinion, the lease contract prohibited Northpointe
from terminating a tenancy without a 30-day pretermination notice. In other words, Northpointe could not have demanded that Renee vacate the premises before May 31. There is no contention that by relocating before the lease naturally terminated, Renee received any refund. Thus, the fact that Renee, in fact, relocated before May 31 is immaterial.
Similarly, Northpointe had no legal right to interfere with Keith's possessory interest between the time Renee relocated and May 31. Thus,a fortiori, Northpointe had no right to bar Keith's access to his leasehold before Renee relocated. In other words, Northpointe had no right to threaten Keith with arrest if he attempted to return to the Johnsons' apartment. To interfere with Keith's access to his apartment by threats or other forms of intimidation before the expiration of the tenancy subjected Northpointe to liability for breach of the lease contract and for breach of the implied covenant of quiet enjoyment in particular.
We hasten to point out that at least two facts — crucial to the foregoing discussion — are in sharp dispute. First, Jacobs denies that she ever told anyone that Keith could not return to the apartment. However, Johnson presented Renee's affidavit, which stated in pertinent part:
 "On May 19, 1996, Keith and I were involved in a domestic dispute at our apartment which resulted in Keith being *Page 903 
arrested and removed by authorities from our apartment.
 On the same night as my dispute with Keith, apartment manager, Peggy Jacobs, called me regarding the situation, and my intentions regarding whether I intended to continue to live at Northpointe. Peggy and I were friends as Peggy had confided in me on occasion about her marital troubles. Peggy told me that I could stay or leave, but under no circumstances was Keith allowed to return to Northpointe Apartments, and if he did, she would have him arrested. She told me to warn Keith accordingly.
 "The next day I received a phone call from Keith's sister, Lisa Janes, saying that she wanted to come by and pick up some clothes and things for Keith. I told her, `Okay.' When I saw Lisa at the apartment I told her to tell Keith that, according to manager Peggy Jacobs, Keith was not permitted to return to our apartment, and if he did, she would call the police to have him arrested."
(Emphasis added.) Renee's version of the facts is supported by the affidavit of Lisa Janes, stating in part:
 "On or about May 20, 1996, I saw Keith at my father's house in Saraland, Alabama, upon our return from the hospital where Keith was admitted. He was complaining of soreness and pain in the abdominal area. Keith asked me if I would go to his apartment at Northpointe to pick up some clothes and other personal items for him.
 "On the same day I went to Keith's Northpointe apartment to do as he had asked. While I was there, Keith's wife, Renee, told me to tell Keith that the apartment manager had told her (Renee) that Keith was not permitted to return to the Northpointe Apartments under any circumstances, and that if he did, she would call the police. When I returned to my father's house I passed along this warning to Keith because I did not want him to have any more trouble."
(Emphasis added.) These affidavits are further supported by the deposition testimony of Keith and Hayward Johnson. Specifically, Keith testified that Jacobs warned him by telephone on the afternoon of May 24 not to come to the apartment in person to retrieve the personal items she had placed in the breezeway.
The second crucial fact in dispute is the date of the telephone conversation between Keith and Peggy Jacobs, and, consequently, the date on which Keith and Hayward Johnson attempted to retrieve Keith's personal property. Northpointe contends that those events could not have predated June 7, 1996, that is, that they came after the tenancy had expired.[2] Resolution of such factual disputes is, however, the function of the jury. The trial court erred, therefore, in entering the summary judgment in favor of Northpointe on the breach-of-contract claim.
 II. CONVERSION
Johnson's conversion claim is based primarily upon the allegation that a large *Page 904 
number of his most valuable and prized personal items were not among the items presented to Hayward Johnson on May 24. In other words, he alleges that they are missing and that, to date, no account has been made of their whereabouts. Many of these items were listed in Renee's affidavit, which stated in part:
 "On May 20, I decided to move out of our apartment and into a one bedroom apartment within the complex. I do not remember whether I signed a Notice to Vacate or not.
 "I stayed at Northpointe because I did not have any other place to go. I moved things such as a TV, microwave, mattresses off our bed and clothes belonging to me and the kids and moved them to the one bedroom apartment. I did not tell Keith that I was moving out. I left/did not move out the dining room set, living room set, living room TV, desk, dresser, end tables, frames of our kids' bunk beds, two dressers of the kids, mirrors and Keith's personal property, including his large collection of tools, other personal property and his memorabilia. Peggy told me that she would give Keith through that weekend to get his property out. Peggy called me more than once to see if I had gotten everything out that I wanted out."
(Emphasis added.)
Northpointe opposes Johnson's conversion claim on two grounds. First, it contends that Northpointe is shielded from liability for any "theft" of Johnson's property by an "exculpatory clause" contained in ¶ 21 of the lease contract. Brief of Appellee, at 12. Second, it contends that "everything removed from [Johnson's] apartment was removed pursuant to Renee's instruction" and, "[t]herefore, any property that may have been removed from apartment 86 at Renee's instruction . . . was not converted."Id. at 15-16. We first address the effect of the "exculpatory clause."
 A. EXCULPATORY CLAUSE
Paragraph 21 of the lease agreement provides in pertinent part:
 "The Lessor . . . shall not be liable or responsible in any manner to the Lessee . . . for . . . property damage, property loss (including decrease in value of property), or any other type of loss or damage giving rise to any claim for damages . . ., which results from negligence and/or fault, except willful misconduct, and which arises, in whole or in part, from . . . conditions relating to theft, burglary, vandalism, acts of violence, other acts of third parties, acts of other Lessees of the complex, and any acts or matters relating to security; and any conditions or circumstances relating to any services or undertakings provided by the Lessor. . . ."
(Emphasis added.)
Northpointe's reliance on ¶ 21 is misplaced, for two reasons. First, Northpointe misperceives the nature of Johnson's claim. Johnson's conversion count alleges that Northpointe willfully or intentionally "converted Plaintiff's personal property by its exercise of dominion and control over it to the exclusion and in defiance of Plaintiff's rights therein." In other words, Johnson's claim does not rest on allegations of "theft" by "acts of third parties." On the contrary, Johnson alleges that the agents and employees of the second party, namely,Northpointe itself, deprived him of his property.
Second, ¶ 21 expressly excepts the "willful misconduct" of agents or employees of Northpointe. A fortiori, it exceptsintentional torts. Conversion is an intentional tort. Keys v.Chrysler Credit Corp., 303 Md. 397, 414, 494 A.2d 200, 208 (1985). "The intent required is not necessarily a matter of conscious wrongdoing. It is rather an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights." W. Keeton, Prosser Keeton on Torts § 15 (5th ed. 1984). Moreover, "[a] mistake *Page 905 of law or fact is no defense. `Persons deal with the property in chattels or exercise acts of ownership over them at their peril,' and must take the risk that there is no lawful justification for their acts." Id. (emphasis added) (footnote omitted). For these reasons, ¶ 21 does not shield Northpointe from liability for conversion.
 B. RENEE'S INSTRUCTIONS
Once again, Northpointe mischaracterizes the evidence. It suggests that Renee specifically instructed Northpointe to remove, and dispose of, Keith's personalty. However, the only evidence offered in support of this suggestion is a hearsay statement advanced by Jacobs. Specifically, Jacobs said: "Renee had told me, `here are my keys, I got everything I want, I don't care what you do with the rest of it." Record, at 48. In other words, assuming the validity and admissibility of this statement, Renee neither purported to sell, nor give, the remainder of the Johnson property to anyone. At most, it suggests that Renee was content to abandon the items she did not take with her.
To be sure, abandonment is a defense to an action for conversion.Shabazz v. Payne, 607 So.2d 238, 239 (Ala.Civ.App. 1992); Wirth v. Heavey, 508 S.W.2d 263, 267 (Mo.Ct.App. 1974). However, in Alabama, there is "a presumption that one does not intend to abandon" property of value. Milford v. Tennessee River Pulp Paper Co.,355 So.2d 687, 689 (Ala. 1978). "Abandonment of property requires intent plus an act. A sufficient act is one that manifests a conscious purpose and intention of the owner of personal property neither to use nor to retake the property into his possession." Wirth, 508 S.W.2d at 267; see also Milford, 355 So.2d at 689. Obviously, "[a] determination of abandonment is a finding of fact." Newman Signs, Inc.v. Hjelle, 317 N.W.2d 810, 817 (N.D. 1982).
Northpointe has cited no authority for the proposition that a wife, in prematurely vacating a leasehold held jointly with her husband, may unilaterally, without the knowledge or acquiescence of her husband, effect the abandonment of jointly owned personalty remaining on the leasehold premises. Even if such a rule should exist in Alabama and we do not now hold that it should — it would be fact-specific and, therefore, not likely to be subject to a motion for summary judgment.
In this connection, we quote once again from Renee's affidavit:
 "I stayed at Northpointe because I did not have any other place to go. I moved things such as a TV, microwave, mattresses off our bed and clothes belonging to me and the kids and moved them to the one bedroom apartment. I did not tell Keith that I was moving out. I left/did not move out the dining room set, living room set, living room TV, desk, dresser, end tables, frames of our kids' bunk beds, two dressers of the kids, mirrors and Keith's personal property, including his large collection of tools, other personal property and his memorabilia. Peggy told me that she would give Keith through that weekend to get his property out. Peggy called me more than once to see if I had gotten everything out that I wanted out.
 "On Friday of that week I saw a pickup truck being loaded with Keith's belongings by apartment employee John Vaughn and others. I figured that they were helping Keith move his stuff out.
 After the weekend, I talked to Peggy who said that Keith had come and picked up his stuff after she, her husband and Anthony [Sims] (Northpointe's maintenance man) had moved it out into the breezeway because they had to get it out for the other tenant.
 About one month later I saw my porch swing on Anthony's porch. I knew it was mine because I had painted the front white, but had not painted the back. I also saw grease on the armrest from the barbecue grill which had been placed next to it on my porch. The *Page 906 
chain and the way the chain was secured also indicated to me that it was my swing. I never said anything to Peggy, Anthony or anyone else about the swing, because I had no other place to go and was afraid I would be kicked out. I was working two gas station jobs and had no family in Mobile. The porch swing later disappeared from Anthony's front porch."
(Emphasis added.)
The emphasized portions of this excerpt illustrate two elements particularly detrimental to Northpointe's abandonment defense. First, some of the property was not jointly owned, but was Keith'sseparate property. Thus, even if we did recognize that, under some circumstances, a wife could unilaterally effect the abandonment of jointly owned personalty remaining on a jointly held leasehold, that principle would not apply in this case, in which the plaintiff indisputably alleges the conversion of some separately owned personalty.
Second, Renee's affidavit provides strong evidence against the argument that she intended to abandon even the jointly owned personalty. Specifically, regarding the porch swing she identified as being used by Anthony Sims, a Northpointe employee, she said: "I never said anything to Peggy, Anthony or anyone else about the swing, because I had no other place to go and was afraid I would be kicked out." It is clear from this statement that she harbored questions about why and how a swing, apparently belonging to her and Keith jointly, had come into the possession of a Northpointe employee. Logically, if she had intended to abandon the swing, as Northpointe asserts she did, she would not have been disturbed by the notion that Northpointe or its employee had taken her swing. Significantly, Northpointe does not deny that some of the Johnson personalty ended up in the possession of its employees.
In short, Northpointe has not carried its burden of production on the defense of abandonment. Because there are numerous issues of fact for a jury to resolve, the trial court erred in disposing of the conversion claim by a summary judgment.
 III. TREPASS
Much of what we have said heretofore in this opinion is equally applicable to Johnson's trespass claim and need not be repeated here. Suffice it to say that the trial court erred in resolving the trespass claim on a motion for summary judgment.
 IV. CONCLUSION
The judgment of the trial court is reversed, and this cause is remanded for further proceedings.
REVERSED AND REMANDED.
Hooper, C.J., and Maddox, Houston, See, Lyons, Brown, and Johnstone, JJ., concur.
[1] These factual allegations are set forth in materials Johnson submitted in opposition to Northpointe's motion for a summary judgment, including the affidavits of Renee Johnson and Lisa Janes and the deposition testimony of Hayward and Keith Johnson.
[2] We take this opportunity to point out that Northpointe mischaracterizes the evidence relating to this crucial date. Northpointe produced an invoice suggesting that the apartment wasrepainted on June 7. In its brief, Northpointe states: "Plaintiff has also alleged that Northpointe took possession of `his apartment' before the lease had terminated. That is not the case. Even Plaintiff's father admitted in his deposition that when he came to pick up Plaintiff's belongings, there were painters inthe apartment." Brief of Appellee, at 16. However, Hayward Johnson did not say that "there were painters in the apartment," but that Jacobs told him that there were painters in the apartment, and denied him access on that basis. Specifically, Hayward Johnson testified:
 "And I asked Peggy, `Is this all of Keith's stuff?' And she said, `Yes.' And I said, `It can't be.' I said, `My G__, you know, there is no way in the world that this could be all of the stuff that the boy had.' And I asked her to let me into the apartment. She told me that the painter was in there and I could not go into the apartment."
Record, at 163 (emphasis added).