MURDOCK, Justice.
Willie Home and 44 other former tenants of the Harbor Landing apartment complex (“Harbor Landing”) appeal from a summary judgment entered by the Mobile Circuit Court on their claims of breach of contract, wrongful eviction, breach of the covenant of quiet enjoyment, conversion, fraudulent suppression, and intentional infliction of emotional distress or the tort of outrage against TGM Associates, L.P., the entity that managed the complex (“TGM *619 Associates”), TGM Harbor Landing, Inc., the owner of Harbor Landing (“TGM Harbor Landing”), and several other defendants. We affirm in part, reverse in part, and remand.

I. Facts and Procedural History

Harbor Landing consisted of a 200-unit complex that comprised IB two-story apartment buildings, an office, and a common area containing a swimming pool, tennis courts, and basketball courts. The complex fronted Mobile Bay to the west and the mouth of Dog River to the north. TGM Associates operated the complex pursuant to a 1995 management agreement with TGM Harbor Landing.[1] All but 7 of the plaintiffs in this action rented apartments in buildings 8 through 13 of the complex.
Paragraph 13 of the lease agreement signed by every tenant residing at Harbor Landing provided, in pertinent part:
“13. STRUCTURAL DAMAGE: If the leased premises, or the building in which the leased premises is located shall be damaged by fire or by other unforeseen events, without fault of the lessee, then, and in that event, the lessor shall have the option to decide whether the lessor shall or shall not repair and restore said building or leased premises to their original shape; and if the lessor decides to repair and restore the building or the rented premises as aforesaid, then, from the time such damages occur until the repairs are completed, an equitable abatement of the monthly installments will be allowed. It is agreed, however, that if the damage is such as not to render the leased premises uninhabitable for the purpose for which they are rented, then there shall be no abatement of the rent while the repairs are being made.”
Paragraph 15 of the lease agreement provided, in pertinent part:
“15. TERMINATING LEASE: If either the Lessee or [TGM Associates] desires that this lease terminate at the expiration of its term, including month to month tenancy, one must give to the other WRITTEN NOTICE TO BE RECEIVED NOT LESS THAN THIRTY (30) DAYS PRIOR TO THE EXPIRATION OF THE LEASE TERM. If the written notice is given less than thirty (30) days prior to the expiration date, the Lessee’s obligation to pay rent shall extend to the number of days required to fulfill the thirty (30) day notice period.”
(Capitalization in original.)
In the early morning of August 29, 2005, Hurricane Katrina made landfall as a category 5 hurricane near the Louisiana-Mississippi border. Hurricane Katrina inflicted substantial damage to Harbor Landing, resulting in the condemnation of buildings 1 through 7 in the complex.
Immediately after Hurricane Katrina, TGM Associates, which maintains its headquarters in New York, dispatched teams to help the residents of Harbor Landing, to make damage assessments, and to determine whether the complex could remain open. The record indicates, and the plaintiffs do not dispute, that TGM Associates spent over $200,000 at Harbor Landing in the first month following Hurricane Katrina to clean up debris, to remove excess water from the property, to hire security guards, and to provide direct aid to the residents of the complex.
*620 On August 31, 2005, TGM Associates sent a notice to all the residents of Harbor Landing informing them that TGM Associates was offering each of them a “$500 relocation gift check ... to help during these hard times.” All the plaintiffs accepted these “relocation gift” checks, and each signed a document “acknowledging] the receipt of the above referenced relocation gift in the amount of $500.”[2] TGM Associates also informed the residents in early September that no rent would be charged in September.
On September 8, 2005, TGM Associates provided written notice to the occupants of buildings 1 through 7 that they must vacate them apartments immediately, which they did. The trial court found, and the parties do not dispute, that the units in buildings 8 through 13 sustained varying degrees of damage, but that all of those units were habitable after Hurricane Katrina.
On September 28, 2005, TGM Associates issued a “Lease Termination Notice” to the remaining tenants at Harbor Landing, including the plaintiffs still residing in buildings 8 through 13. The termination notice stated that because Harbor Landing had “sustained significant structural damage caused by Hurricane Katrina,” TGM Associates judged every apartment in the complex to be “uninhabitable.” Consequently, the termination notice stated that each resident’s lease agreement “will terminate ten (10) days from the date hereof,” 1.e., October 8, 2005. The residents were ordered to “surrender possession of the premises ten (10) days from the date of this notice” and to “remove all personal property from the premises and surrender the keys within the time allowed in this notice.” The termination notice informed residents that “[u]pon timely surrender of possession of the premises, your security deposit will be refunded to you.”
Deposition testimony in the record reveals that before the termination notice was issued, a few of the plaintiffs had been told by TGM Associates’ staff members at Harbor Landing that they would not have to move out of their apartments. When some of the plaintiffs questioned TGM Associates’ staff members at Harbor Landing about the termination notice, at least six of them were told that, if they did not vacate their apartments by October 8, 2005, they would be arrested for criminal trespass, their personal property would be forcibly removed from them apartments, and/or their credit would be ruined by the process of eviction.
On September 29, 2005, the toilet in the apartment of one of the plaintiffs, James Williams, who resided in building 8, was overflowing with raw sewage. Williams went outside and unscrewed an overflow valve adjacent to building 8, which caused raw sewage to flow throughout buildings 8 and 9. The Mobile County Health Department issued an immediate evacuation order for residents in those two buildings as a result of the health hazard caused by the release of the raw sewage. The evacuation order informed residents in buildings 8 and 9 that efforts would be made to “remediate the current threat to public health” so that residents would have “the opportunity to return to these complexes and retrieve their belongings prior to the lease termination date, October 8, 2005.”
As the trial court related in its summary-judgment order:
“Every plaintiff in this case departed by the scheduled October 8 date, with the exception of Willie Home and Demetrius Dudley, who voluntarily left the next *621 day. TGM [Associates] did not initiate eviction proceedings against any of the plaintiffs. The plaintiffs turned in their keys and received a full refund of their original security deposits, with the exception of several plaintiffs who owed back rent.”
Each of the plaintiffs who received a security deposit signed a receipt acknowledging that he or she was “entitled to receive the return of the security deposit” and had “received the security deposit check in the amount detailed above.”
On December 13, 2005, the plaintiffs filed this action against TGM Associates, TGM Harbor Landing, several employees of TGM Associates, and others, alleging breach of contract, wrongful eviction, breach of the covenant of quiet enjoyment, trespass, conversion, fraud, and intentional infliction of emotional distress or the tort of outrage. The plaintiffs acknowledged that they vacated the premises within the time stipulated in the termination notice, but they alleged that they did so only because they were threatened by the staff of TGM Associates with lockouts, utility cutoffs, the forfeiture of personal belongings, loss of security deposits, injury to their credit, and/or arrest for criminal trespass. They also alleged that staff members of TGM Associates told several of the plaintiffs that they would not have to move out of their apartments, and, as a result, those plaintiffs did not attempt to find alternate living arrangements between August 31, 2005, and the date of the termination notice, September 28, 2005.
On April 20, 2007, the defendants filed a motion for a summary judgment as to all claims. The plaintiffs filed a response, and the trial court held a hearing on the motion on July 13, 2007. Following the hearing, the trial court entered an order on September 25, 2007, granting the defendants’ motion for a summary judgment as to all claims. On October 25, 2007, the plaintiffs filed a Rule 59(e), Ala. R. Civ. P., motion to alter, amend, or vacate the judgment, which the trial court denied on January 22, 2008. The plaintiffs appeal the summary judgment against them on all claims except their claim alleging trespass.

II. Standard of Review

“The standard by which this Court will review a motion for summary judgment is well established:
“ ‘The principles of law applicable to a motion for summary judgment are well settled. To grant such a motion, the trial court must determine that the evidence does not create a genuine issue of material fact and that the movant is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. When the movant makes a prima facie showing that those two conditions are satisfied, the burden shifts to the nonmovant to present “substantial evidence” creating a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (AJa.1989); § 12 — 21—12(d)[,] Ala.Code 1975. Evidence is “substantial” if it is of “such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” West v. Founders Life Assur. Co. of Florida, 547 So.2d 870, 871 (Ala.1989).
“ ‘In our review of a summary judgment, we apply the same standard as the trial court. Ex parte Lumpkin, 702 So.2d 462, 465 (Ala.1997). Our review is subject to the caveat that we must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Hanners v. Balfour *622 Guthrie, Inc., 564 So.2d 412 (Ala.1990).’ ”
Payton v. Monsanto Co., 801 So.2d 829, 832-33 (Ala.2001) (quoting Ex parte Alfa Mut. Gen. Ins. Co., 742 So.2d 182, 184 (Ala.1999)).

III. Analysis

The arguments presented by the plaintiffs on appeal refer only to the circumstances faced by those plaintiffs who resided in buildings 8 through 13. The trial court’s judgment therefore is affirmed as it relates to the plaintiffs who resided in buildings 1 through 7. The balance of the analysis as set forth below is provided, therefore, only in reference to those plaintiffs who resided in buildings 8 through 13. Likewise, except as expressly noted, references hereinafter to the plaintiffs are references to those plaintiffs who resided in buildings 8 through 13.

A. Breach of Contract

The plaintiffs first contend, as they did before the trial court, that TGM Associates breached their lease agreements by issuing the 10-day termination notice despite the fact that paragraph 15 of the lease agreement requires notice of at least 30 days by either party wishing to terminate the lease. The defendants’ first response, as it was before the trial court, is that paragraph 13 of the lease agreement authorized TGM Associates to determine that each of the buildings at Harbor Landing was uninhabitable and, therefore, that early termination of the leases was permissible under the lease agreement.
The trial court noted that paragraph 13 “entitled TGM [Associates] to determine, following [Hurricane] Katrina, whether or not to repair the plaintiffs’ units.” The trial court admitted, however, that paragraph 13 was “silent on what would occur in a situation such as that presented in Katrina,” where half of the apartment buildings were practically destroyed. The trial court concluded that “the only reasonable meaning of [paragraph 13 of the lease is that following an unforseen disaster of Katrina’s magnitude, which destroyed a large portion of the Harbor Landing complex and left the remainder subject to health and safety issues, TGM [Associates] could terminate the leases.” The trial court cited the spillage of raw sewage that occurred in buildings 8 and 9 the day after TGM Associates issued its termination notice as “evidence to support [TGM Associates’] decision to terminate the leases.”
“It is well settled that lease agreements are contracts and that the general principles of contract construction apply in ascertaining the scope and meaning of a lease agreement.” Bowdoin Square, L.L.C. v. Winn-Dixie Montgomery, Inc., 873 So.2d 1091, 1098 (Ala.2003). A contract “ ‘ “must be given effect, if at all, according to its plain and inescapable meaning.”’” James A. Head & Co. v. Rolling, 265 Ala. 328, 338, 90 So.2d 828, 836 (1956) (quoting Oates v. Lee, 222 Ala. 506, 507, 133 So. 44, 45 (1931), quoting in turn Union Central Relief Ass’n v. Thomas, 213 Ala. 666, 667, 106 So. 133, 134 (1925)). Moreover, where the terms of a contract are “plain and unambiguous, there is no room for interpretation, and the parties thereto ‘may stand upon the letter’ of the contract.” Dunlap v. Macke, 233 Ala. 297, 300, 171 So. 721, 724 (1937).
The trial court’s interpretation of paragraph 13 of the lease agreement ignores the plain meaning of the provision. Paragraph 13 provides, in part, that
“[i]f the leased premises, or the building in which the leased premises is located shall be damaged by fire or by other unforeseen events, without fault of the *623 lessee, then, and in that event, the lessor shall have the option to decide whether the lessor shall or shall not repair and restore said building or leased premises to their original shape.... ”
Paragraph 13 clearly addresses the lessor’s right to elect to repair or not to repair with respect to an apartment within a building or with respect to a building within the apartment complex. It does not provide TGM Associates the right to elect to repair or not to repair with respect to the entire apartment complex. As the trial court itself noted, paragraph 13 is silent in that respect. The trial court essentially inserted a clause into paragraph 13 that permits TGM Associates to terminate the leases of all tenants in the complex at its election because Hurricane Katrina caused severe damage to portions of the apartment complex. It did so despite acknowledging the undisputed fact that the apartments in buildings 8 through 13 were habitable in the aftermath of Hurricane Katrina. In short, the trial court failed to give effect to paragraph 13 according to its plain meaning.
To some degree, the trial court’s interpretation of the lease agreement and the defendants’ first argument regarding the plaintiffs’ breach-of-contract claim rely on the fact that Hurricane Katrina was a catastrophic event not accounted for in the ordinary course of business of the landlord-tenant relationship. In essence, the defendants contend that Hurricane Katrina provided TGM Associates with a bona fide.legal reason to terminate the plaintiffs’ leases early. The trial court stated— and the defendants argue on appeal — that, under the circumstances created by Hurricane Katrina, “if TGM [Associates] sought to enforce a tenant’s lease when he or she wished to cancel it, this Court would have concluded that the lessee had the right to terminate the lease.” The implication is that the converse also ought to be true, i.e., that under these circumstances TGM Associates had the right to invoke early termination of its lease agreements with the plaintiffs.
The premise of the defendants’ argument and the trial court’s reasoning does not accurately reflect Alabama law, however. Indeed, the very reason paragraph 13 exists in the lease agreement is that, without such a provision, lessees like the plaintiffs would remain responsible for paying rent on their leases after an event like a hurricane, precisely because their apartments were not destroyed.
“ ‘The settled rule is that a lessee of premises destroyed during the term by unavoidable accident is not relieved from an express promise or covenant to pay rent, unless he protects himself by a stipulation that the rent shall cease in such event, or unless the lessor covenants to rebuild or repair, or unless the destruction is of the entire subject-matter of the lease, so that nothing remains capable of being held or enjoyed, which operates a dissolution of the tenancy.’ ”
Brown v. Williams, 576 So.2d 195, 197 (Ala.1991) (quoting Cook v. Anderson, 85 Ala. 99, 103, 4 So. 713, 714 (1887)) (citations and some emphasis omitted; other emphasis added). See also Pizitz-Smolian Co-op. Stores v. Randolph, 221 Ala. 458, 464, 129 So. 26, 31-32 (1930) (noting the general rule that the lessee of premises destroyed by an unavoidable accident is not relieved from an express covenant to pay rent (subject to an agreement otherwise), but noting “well-recognized exceptions, such as where the sole subject-matter of the lease is an apartment, room, or building, without interest in the land other than the right of subjacent support, and the entire subject-matter of the lease is destroyed so that nothing remains capable of being held or enjoyed, rendering per *624 formance impossible....” (citations omitted)).
Although it is true that Hurricane Katrina was an unusual weather event in terms of the scale of the damage it caused, TGM Associates could have accounted for the occurrence of the partial destruction of the apartment complex in its lease agreements just as it accounted for damage sustained to a building or an apartment. It did not do so, and a court cannot change the lease agreement after the fact to justify the landlord’s action.
The trial court held, in the alternative, that the plaintiffs terminated their leases by their own actions and, therefore, that them breach-of-contract claim cannot be sustained. For support of this holding, the trial court cited a provision of the lease agreements titled “Security Deposit Return,” which provided in part that TGM Associates was not obligated to refund a lessee’s security deposit until “the full term of the lease has expired” and “[a]ll keys are returned.” It then noted that the plaintiffs who were eligible received full refunds of their security deposits and all the plaintiffs turned in their keys and vacated their apartments by the date provided in the termination notice or the day after that date.
The fact that the “Security Deposit Return” provision of the lease agreement provided that TGM Associates “shall not be obligated to release the Security Deposit” unless certain conditions were met does not, however, prohibit TGM Associates from choosing to refund tenants’ security deposits without all the listed conditions being met.[3] The “Security Deposit Return” provision does not operate as a lease-termination provision. It simply spells out the conditions under which TGM Associates legally must refund a lessee’s security deposit.
More generally, the mere fact that the plaintiffs accepted the return of their security deposits and moved out of their apartments does not necessarily mean that they voluntarily terminated their leases. In essence, the trial court in its alternate holding concerning the breach-of-contract claim concluded that the plaintiffs, by accepting their security deposits and vacating their apartments, waived TGM Associates’ breach of the lease agreement resulting from its early termination notice. But “[a] waiver consists of a ‘voluntary and intentional surrender or relinquishment of a known right,’ Dominex, Inc. v. Key, 456 So.2d 1047, 1058 (Ala.1984), and the burden of proof in establishing a waiver rests upon the party asserting the claim.” Bentley Sys., Inc. v. Intergraph Corp., 922 So.2d 61, 93 (Ala.2005). Moreover, whether a party has voluntarily or intentionally waived a known right is normally a jury question. See Edwards v. Allied Home Mortgage Capital Corp., 962 So.2d 194, 209 (Ala.2007).
The receipt signed by plaintiffs acknowledging that they received their security deposits does not state in any way that the recipient was waiving any possible contractual breach by TGM Associates.[4] *625 No provision in the lease agreement, including the “Security Deposit Return” provision, states that by accepting his or her security deposit and vacating the premises a lessee waives any possible breach of the lease agreement by the lessor. Thus, the record as a whole indicates that a genuine issue of material fact exists as to whether, by vacating their apartments by the deadline given in the termination notice, the plaintiffs intentionally waived the alleged breach of the lease agreement committed by TGM Associates when it issued the 10-day notice of termination.

B. Wrongful Eviction

The plaintiffs contend that the trial court erred in entering a summary judgment in favor of the defendants on the plaintiffs’ claim alleging wrongful eviction. Specifically, the plaintiffs contend that TGM Associates violated the eviction statutes in force at the time — the unlawful-detainer statutes, § 6-6-310 et seq., Ala. Code 1975, and the Sanderson Act, § 35-9-80 et seq., Ala.Code 1975.[5]
The unlawful-detainer statutes permit a landlord to recover double the annual rent from a tenant who “forcibly or unlawfully retains possession” of a tenement “after the expiration of his term or refuses to surrender the same on the written demand of lessor-” § 6-6-314, Ala.Code 1975. The Sanderson Act, in force at the time, “serve[d] essentially the same function as an ejectment action — it providefd] a landlord with a means to evict a tenant wrongfully detaining possession.” Ex parte Moore, 880 So.2d 1131, 1138 (Ala.2003). It applied “[i]n all cases where a tenant shall hold possession of lands or tenements over and beyond the term for which the same were rented or leased to him, or after his right of possession has terminated or been forfeited....” § 35-9-80, Ala.Code 1975.
As we noted in the rendition of the facts, none of the plaintiffs forcefully held over or retained possession of their apartments more than a day after the deadline set in the termination notice, and TGM Associates never initiated eviction proceedings against any of the plaintiffs. Therefore, there was not, and could not be, a violation of the eviction statutes at issue. Therefore, the trial court correctly entered a summary judgment in favor of the defendants as to this claim.

C. Breach of the Covenant of Quiet Enjoyment

The plaintiffs alleged in their complaint that the defendants “unilaterally, willfully, and non-judicially engaged in self-help eviction of plaintiffs from their homes and, perforce, necessarily interfered with their peaceful enjoyment of same.... As such, defendants constructively evicted plaintiffs.” The trial court concluded that the defendants’ action
“does not rise to the level of construc-ti[ve] eviction, which occurs when the landlord’s actions do not result in the actual dispossession of the tenant. Had TGM [Associates] created a nuisance to force out the plaintiffs without issuing the ten-day notice to quit, such an action *626 may have constituted a constructive eviction, but such did not occur.”
(Citations omitted.)
In reaching this conclusion, the trial court failed to acknowledge the full nature of the allegations in the complaint, particularly the plaintiffs’ allegation that the defendants’ “interfered with their peaceful enjoyment” of the leased premises.[6]
Concerning the covenant of quiet enjoyment, the plaintiffs rely upon this Court’s decision in Johnson v. Northpointe Apartments, 744 So.2d 899 (Ala.1999). In Johnson, this Court explained the covenant of quiet enjoyment as follows:
“ ‘It is both a covenant and a warranty. The landlord warrants that the tenant will not be disturbed in possession by any other person with a superior legal right to possession.’ [Roger Cunningham, William Stoebuck, & Dale Whitman, The Law of Property § 6.30, pp. 292-93 (1984) ] (footnote omitted); see also Abrams v. Watson, 59 Ala. 524 (1877). ‘Moreover, the landlord covenants not to evict the tenant himself, actually or constructively. Thus, the covenant is breached ... if, during his term, the tenant is disturbed by a third person or by the landlord.’ Cunningham, Stoebuck, & Whitman, supra, at § 6.30, p. 293.... ‘A breach of the covenant of quiet enjoyment occurs when the landlord substantially interferes with the tenant’s beneficial use or enjoyment of the premises.’ Echo Consulting Servs., Inc. v. North Conway Bank, 140 N.H. 566, 669 A.2d 227 (1995) (citing 2 R. Powell, Powell on Real Property ¶ 232[1] (1994)). ‘Even if not substantial enough to rise to the level of a constructive eviction ..., such interference may constitute a breach of the covenant of quiet enjoyment entitling the tenant to damages.’ Id.”
Johnson, 744 So.2d at 902 (emphasis omitted).
In Johnson, Keith Johnson and his wife Renee were leasing an apartment from Northpointe Apartments in Saraland (“Northpointe”) on a month-to-month basis. They had paid their rent through May 31,1996. On the night of May 19, the Johnsons became involved in a domestic dispute, and Keith Johnson was arrested. On May 20, Renee Johnson signed a “Notice to Vacate” the apartment. Because a provision of the lease agreement required a 30-day notice to vacate, Renee Johnson and the manager at Northpointe agreed to backdate the notice to May 1, 1996, so Renee Johnson would not have to pay additional rent beyond the rent already paid to lease the apartment through May 31.[7] Renee Johnson vacated the apartment a few days later.
On May 24,1996, the manager at North-pointe ordered a Northpointe employee to *627 remove the remaining personal property in the apartment and to place it in the “breezeway” of the apartment complex. The Northpointe manager then telephoned Keith Johnson and informed him that his personal belongings had been removed from the apartment and that if he did not have them picked up by the end of the business day, Northpointe would not be responsible for them. The manager also told Keith Johnson that he could not retrieve the property personally because he was not allowed on the premises and that he would be arrested if he showed up on complex property. When a friend of Keith Johnson’s arrived to pick up Johnson’s belongings, the manager “presented him with ‘a couple of garbage sacks’ of clothes and assorted items, one three-piece sofa, and a mattress.” 744 So.2d at 901. The friend then sought entrance into the Johnsons’ apartment, but the manager denied him access.
Keith Johnson subsequently sued Northpointe, alleging, among other things, breach of contract for “ ‘denying [him] his right of possession of the leased property for eleven days,’ and, ‘by interfering with [his] covenant of quiet enjoyment of the leased property.’ ” 744 So.2d at 902. The trial court entered a summary judgment in favor of Northpointe. This Court reversed the trial court’s judgment as to the breach-of-contract claim, explaining:
“Pursuant to the backdated Notice, the Johnsons’ tenancy period did not terminate until May 31. Northpointe does not — indeed, could not — contend that it had a right to interfere with Renee’s right of possession before the lease terminated on May 31. This is so because, as we noted earlier in this opinion, the lease contract prohibited North-pointe from terminating a tenancy without a 30-day pretermination notice. In other words, Northpointe could not have demanded that Renee vacate the premises before May 31....
Johnson v. Northpointe Apartments, 744 So.2d at 902 (some emphasis omitted; final emphasis added).
The Court in Johnson concluded that the covenant of quiet enjoyment is breached “by threats or other forms of intimidation before the expiration of the tenancy.” 744 So.2d at 902. In the present case, the plaintiffs presented uncontra-dicted evidence that staff members at Harbor Landing threatened at least six of them with arrest, the removal of their property, and/or ruining their credit if they did not leave the premises by October 8, 2005, a date earlier than the expiration of their tenancies.[8] Under Johnson, the *628 plaintiffs presented substantial evidence that TGM Associates interfered with the plaintiffs’ right to quiet enjoyment through the 10-day termination notice and ensuing threats that led them to vacate their apartments. Accordingly, the trial court erred in entering a summary judgment for the defendants as to this count of the complaint.

D. Conversion

The trial court entered a summary judgment for the defendants on the plaintiffs’ conversion claim because it found that the “defendants gave plaintiffs ample opportunity to remove their possessions from the lease premises, both before and after the October 8 deadline” and because the plaintiffs did not present substantial evidence of a demand by the plaintiffs for their property and a refusal by TGM Associates to allow the plaintiffs to recover their property.
“To constitute conversion, there must be a wrongful taking or a wrongful detention or interference, an illegal assumption of ownership, or an illegal use or misuse of another’s property. Covington v. Exxon Co. U.S.A., 551 So.2d 935, 938 (Ala.1989). ‘The gist of the action is the wrongful exercise of dominion over property in exclusion or defiance of a plaintiffs rights, where said plaintiff has general or special title to the property or the immediate right to possession.’ Ott v. Fox, 362 So.2d 836 (Ala.1978) (emphasis added).”
Baxter v. SouthTrust Bank of Dothan, 584 So.2d 801, 804-05 (Ala.1991).
We have already determined that the plaintiffs presented substantial evidence that the defendants breached the lease agreement through the early termination notice and related actions. The plaintiffs also presented evidence indicating that TGM Associates gained possession of personal property left behind by some of the plaintiffs as a result of the early termination. Therefore, a genuine issue of fact was presented as to whether the defendants wrongfully took possession of the personal property left behind by the plaintiffs.
The defendants contend that the deposition testimony of the vast majority of the plaintiffs demonstrates that they either did not want the property they left behind or that they did not demand that TGM Associates return the property.
“[Abandonment is a defense to an action for conversion. However, in Alabama, there is ‘a presumption that one does not intend to abandon’ property of value. ‘Abandonment of property requires intent plus an act. A sufficient act is one that manifests a conscious purpose and intention of the owner of personal property neither to use nor to retake the property into his possession.’ Obviously, ‘[a] determination of abandonment is a finding of fact.’ ”
Johnson, 744 So.2d at 905 (citations omitted). Although it is true that some of the plaintiffs testified that they did not care whether their property was returned, others stated that they did want their property returned. At the very least, a factual dispute exists concerning whether some of *629 the plaintiffs had abandoned their property-
As for the failure of some of the plaintiffs to demand their property: “‘A demand is not necessary when there has been a wrongful taking or an exercise of dominion and control over the property inconsistent with the rights of the owner.’ ” Citizens Bank, Enterprise v. Coffee County Bank, Enterprise, 431 So.2d 1203, 1207 (Ala.1983) (quoting Southeastern Mach. Co. v. Tarpley, 398 So.2d 700, 702 (Ala.Civ.App.1981), cert. denied, 398 So.2d 703 (Ala.1981)) (emphasis added). Thus, because the plaintiffs presented substantial evidence that the defendants wrongfully took dominion and control of their personal property, they were not required to demand its return in order to maintain their conversion claim. Accordingly, the trial court erred in entering a summary judgment for the defendants as to the plaintiffs’ claim alleging conversion of their personal property.

E. Fraudulent Suppression

The plaintiffs contend that before the defendants issued the termination notice on September 28, 2005, the defendants fraudulently misrepresented to the plaintiffs that they would be allowed to continue living in their apartments. Inherent in this contention is an allegation that the defendants knew that the plaintiffs would not be allowed to stay in their apartments, yet TGM Associates purposefully or recklessly told at least some of the plaintiffs that they would be able to remain living in their apartments in the aftermath of Hurricane Katrina. The plaintiffs claim that the defendants had decided even before Hurricane Katrina to cease operating Harbor Landing and to sell the property to the highest bidder and that the defendants used Hurricane Katrina as an excuse to effectuate this plan more expeditiously.
The Court finds the plaintiffs’ claim concerning the sale of Harbor Landing to be mere speculation for which the plaintiffs lack substantial evidence. Indeed, as the trial court observed, the fact that the defendants spent over $200,000 in the month after Hurricane Katrina to clean up Harbor Landing and to provide aid to tenants starkly undercuts the plaintiffs’ theory that the defendants used the occurrence of Hurricane Katrina to speed up their supposed plan to liquidate the Harbor Landing property as soon as possible. Even the fact — not considered by the trial court in making its ruling — that the property on which Harbor Landing resided eventually was sold does not help the plaintiffs in this regard, because it may merely demonstrate that the apartment complex eventually was deemed not worth repairing in the wake of Hurricane Katrina.
As the trial court explained, the claim that the defendants’ surreptitiously planned to terminate the lease agreements
“required plaintiffs to submit substantial evidence that TGM [Associates] had a duty to disclose as soon as it determined to terminate the leases; that TGM [Associates] concealed this material fact from the plaintiffs; that by concealing . this from plaintiffs, TGM [Associates] induced plaintiffs to stay at Harbor Landing rather than seek alternative accommodations; and that because of this concealment the plaintiffs were injured by not having more time to look for new living arrangements. Auto-Owners Ins. Co. v. Abston, 822 So.2d [1187, 1197 (Ala.2001) ], citing Foremost Ins. Co. v. Parham, 693 So.2d 409, 423 (Ala.1997). In the absence of any substantial evidence that TGM [Associates] withheld any material information from the plaintiffs concerning the lease termination, the suppression claim fails. No substantial evidence supports the allegation that *630 TGM [Associates] or its employees on site (the individual defendants and Roderick Bonner) knew that TGM [Associates] was planning to shut down Harbor Landing on October 8, 2005 and failed to communicate it.”
We find no error in the trial court’s conclusion in this regard. The record simply does not support a finding that TGM Associates’ staff members at Harbor Landing, regardless of what they told various plaintiffs concerning whether they could stay in their apartments, knew what would happen and made misrepresentations based on that knowledge.

F. Intentional Infliction of Emotional Distress or Tort of Outrage

The trial court concluded that the actions by the defendants in this case did not rise to a level commensurate with the intentional infliction of emotional distress or the tort of outrage. The plaintiffs disagree, emphasizing the fact that the defendants’ conduct occurred in the aftermath of Hurricane Katrina.
“This Court, in 1980, recognized the tort of intentional infliction of emotional distress, or the tort of outrage, and defined the parameters for such an action:
“ ‘[0]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress. The emotional distress thereunder must be so severe that no reasonable person could be expected to endure it. Any recovery must be reasonable and justified under the circumstances, liability ensuing only when the conduct is extreme. Comment, Restatement [ (Second) of Torts ], supra, at 78 [ (1948) ]. By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society. Comment (d), Restatement, supra at 72.’
“American Road Serv. Co. v. Inmon, 394 So.2d 361, 365 (Ala.1980). Furthermore, this Court explained:
“ ‘It should also be noted that this tort does not recognize recovery for “mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.” Comment, Restatement, supra, at 73. The principle applies only to unprivileged, intentional or reckless conduct of an extreme and outrageous nature, and only that which causes severe emotional distress.’
“American Road Serv. Co., 394 So.2d at 364-65.
“Thus, in order to prevail on [a] tort-of-outrage claim, [the plaintiff is] required to present substantial evidence indicating that [the defendant’s] conduct ‘(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it.’ Thomas v. BSE Indus. Contractors, Inc., 624 So.2d 1041, 1043 (Ala.1993).”
Harrelson v. R.J., 882 So.2d 317, 321-22 (Ala.2003).
The plaintiffs contend that the 10-day notice of the termination of their leases coupled with the threats expressed to some of the plaintiffs that they would be arrested, their personal property would be would be forcibly removed from their apartments, and/or their credit would be ruined by the process of eviction constituted the kind of conduct actionable under a theory of intentional infliction of emotional distress or the tort of outrage. They fail *631 to offer any analogous cases to support this contention, however.
In American Road Service Co. v. Inmon, 394 So.2d 361 (Ala.1980), the case in which this Court recognized the tort of outrage, the facts showed that the defendant-employer had “harassed, investigated without cause, humiliated, accused of improper dealings, and ultimately terminated from his job, without justification,” the plaintiff-employee. 394 So.2d at 367. Despite all of these actions, the Inmon Court still found that the defendant’s conduct was not outrageous. In Potts v. Hayes, 771 So.2d 462, 465 (Ala.2000), this Court stated that the tort of outrage is
“so limited that this Court has recognized it in regard to only three kinds of conduct: (1) wrongful conduct in the family-burial context, Whitt v. Hulsey, 519 So.2d 901 (Ala.1987); (2) barbaric methods employed to coerce an insurance settlement, National Sec. Fire & Cas. Co. v. Bowen, 447 So.2d 133 (Ala. 1983); and (3) egregious sexual harassment, Busby v. Truswal Sys. Corp., 551 So.2d 322 (Ala.1989).”
Though the defendants’ conduct may have made the plaintiffs’ lives more difficult — and, in some cases extremely difficult — the 10-day termination notice and even the threats toward some of the plaintiffs that accompanied it do not constitute conduct “so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.”[9] Inmon, 394 So.2d at 365. The trial court did not err in so finding.

IV. Conclusion

As previously stated, we affirm the summary judgment in favor of the defendants insofar as it relates to claims made by those plaintiffs who resided in buildings 1 through 7. As to those plaintiffs who resided in buildings 8 through 13, we conclude that there was introduced substantial evidence to create genuine issues of material fact as to their claims alleging breach of contract, breach of the covenant of quiet enjoyment, and conversion, and, as to those claims, we reverse the trial court’s judgment. The trial court, however, correctly entered a summary judgment in favor of the defendants as to the claims alleging wrongful eviction, fraud, and the intentional infliction of emotional distress or the tort of outrage asserted by those plaintiffs who resided in buildings 8 through 13; its judgment in that regard is affirmed. Accordingly, we affirm the summary judgment in part, reverse it in part, and remand the case to the trial court for further proceedings.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
COBB, C.J., and LYONS, STUART, and BOLIN, JJ., concur.

. TGM Harbor Landing sold the property to another property-development corporation in January 2007.

. The notice to the residents also stated that a separate form was available for each tenant to sign if the tenant decided to accept a return of his or her security deposit "and move out.”

. Indeed, the lease agreement lists 11 such conditions, one of which is that "THIRTY DAYS written notice was given by the Lessee to the Lessor.” (Capitalization in original.) That condition clearly was not fulfilled by many of the tenants of Harbor Landing who vacated the premises in the aftermath of Hurricane Katrina, and yet TGM Associates chose to refund the security deposits of several of those tenants.

. The acceptance of the "relocation gift” likewise does not establish an intentional waiver. The receipt signed by all the plaintiffs acknowledging that they received the "relocation gift” did not state in any way that acceptance of the gift constituted acknowledgment *625 of a waiver of rights. Moreover, the concept of a gift is incompatible with the notion of a reciprocal obligation or waiver of rights; TGM Associates may have meant for residents to use the check toward relocation expenses, but the recipients were not legally bound to do so. In fact, the August 31, 2005, memorandum in which TGM Associates first informed tenants of Harbor Landing of the “relocation gift check” stated that the purpose of the check was simply "to help during these hard times.”

. Sections 35-9-80 through 35-9-88, Ala. Code 1975, were repealed by Act No. 2006-316, effective January 1, 2007.

. The inclusion of the concepts of a breach of the covenant of quiet enjoyment in the count of the complaint alleging a constructive eviction is understandable given the nexus in our law between these two concepts. See Bowdoin Square, L.L.C. v. Winn-Dixie Montgomery, Inc., 873 So.2d 1091, 1104 (Ala.2003).

. The defendants contend that Johnson represents precedent for changing the termination date under a lease as the result of extreme circumstances, just as they did because of Hurricane Katrina. Johnson is distinguishable for several reasons, however, the most apparent being that the Court ”assum[ed] the efficacy of the back-dated Notice to terminate the tenancy under the circumstances of this case,” 744 So.2d at 902, but it did not evaluate that issue because it reversed the trial court’s ruling on the breach-of-contract claim on another basis. In other words, the Johnson Court assumed the efficacy of the backdated notice without settling whether it was, in fact, legitimate. Thus, Johnson does not provide support for TGM Associates' action of shortening the notice of termination provided in the lease agreement from 30 days to 10 days.

. On appeal, the defendants seek to discount the testimony of some of these plaintiffs on more than one claim by noting that their leases had expired by October 8, 2005. The defendants thus contend that these plaintiffs cannot have viable claims against the defendants. Paragraph 16 of the lease agreement provides in pertinent part, however, that
"[f]ailure of either party to give proper termination notice will automatically renew this lease for an additional term an a MONTH-TO-MONTH basis, at the month-
“Similarly, Northpointe had no legal right to interfere with Keith’s possesso-ry interest between the time Renee relocated and May 31. Thus, a fortiori, Northpointe had no right to bar Keith’s access to his leasehold before Renee relocated. In other words, Northpointe had no right to threaten Keith with arrest if he attempted to return to the Johnsons’ apartment. To interfere with Keith’s access to his apartment by threats or other forms of intimidation before the expiration of the tenancy subjected Northpointe to liability for breach of the lease contract and for breach of the implied covenant of quiet enjoyment in particular.” *628 to-month rental rate as established by the lessor, and under such circumstances, either the Lessor or the Lessee shall be required to give a thirty (30) day written notice in order to terminate the lease.”
It is undisputed that TGM Associates did not give "proper termination notice” as provided by paragraph 15 of the lease agreement. Therefore, when the leases of some of the plaintiffs expired, they were automatically renewed on a month-to-month basis, and TGM Associates still needed to provide 30 days' notice to terminate their leases.

. It should not be forgotten, in this regard, that the defendants permitted the plaintiffs and the rest of the tenants residing at Harbor Landing to remain in their apartments rent-free throughout September and provided all of them with the $500 "relocation gift” checks.-