THOMAS, Judge.
. In 1994, DeWayne Oakley and his wife, Nancy Oakley, purchased a parcel of real property (“the premises”) from Jerome Beckman and his wife, Angie T. Beckman. The Oakleys later deeded the premises to Oakley Land Company, L.L.C. (“Oakley”); DeWayne is the managing member of Oakley. Jerome Beckman had operated a boat dealership and repair business .(“the business”) on the premises since 1992. Oakley continued operating the business until October 1996, when it leased the premises to Travis Boating Center, Inc., which, at other times, was Travis Boating Center, LLC, and Travis Boats and Motors, LLC, all of which ultimately became Tracker Marine Retail, LLC (“Tracker Marine”) (hereinafter the four entities will be referred to collectively as “Tracker”).[1] Tracker continued to operate the business on the premises. In 2008, as Oakley prepared to sell the premises to Robert'Bevis, elevated levels of petroleum hydrocarbons (“TPH”) were discovered on the rear' of the premises. After initial efforts to discuss the matter with Tracker representatives were unfruitful, Oakley dug up and hauled away .the .contaminated soil, replaced it with fill dirt, and added recommended equipment to prevent further contamination.,
When Tracker refused to pay the costs Oakley had incurred, Oakley sued Tracker in the Lauderdale Circuit Court, alleging that Tracker had breached certain provisions of the lease agreement, and, in the alternative, seeking damages for trespass to land, negligence, or wantonness. After a bench trial held on April 21, 2014, and September 12, 2014, the trial court entered a judgment in favor of Oakley and against Tracker Marine and awarded $49,960.51 in damages and $17,848.54 in prejudgment interest.[2] The trial court, after an additional hearing, awarded a *515 $53,052.37 attorney fee to Oakley. Tracker Marine filed a timely postjudgment motion, which the trial court denied. Tracker Marine timely appealed the judgment to the Alabama Supreme Court, which transferred the appeal to this court, pursuant to Ala.Code 1975, § 12-2-7(6). Tracker Marine seeks review of whether the evidence established that Tracker had breached a provision of the lease and whether the trial court’s award of damages was in error because it included a sum for improvements to the premises as opposed to the sum necessary to remediate the contamination.
Our review of the judgment in the present case is well settled.
“When ore tenus evidence is presented, a presumption of correctness exists as 'to the trial court’s findings on issues of fact; its judgment based on these findings of fact will not be disturbed unless it is clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence. J & M Bail Bonding Co. v. Hayes, 748 So.2d 198 (Ala.1999); Gaston v. Ames, 514 So.2d 877 (Ala.1987). When the trial court in a nonjury case enters a judgment without making specific findings of fact, the appellate court ‘will assume that the trial judge made those findings necessary to support the judgment.’ Transamerica Commercial Fin. Corp. v. AmSouth Bank, 608 So.2d 375, 378 (Ala.1992). Moreover, [u]nder the ore tenus rule, the trial court’s judgment and all implicit findings necessary to support it carry a presumption of correctness.’ Transamerica, 608 So.2d at 378.”
City of Prattville v. Post, 831 So.2d 622, 627-28 (Ala.Civ.App.2002); see also Rearick v. Sieving, 103 So.3d 815, 818-19 (Ala.Civ.App.2012).
As ^mentioned above, the premises had housed the business since approximately 1992, when the premises were owned by the Beckmans. Oakley took over the business when it acquired the premises in 1994, and it leased the business to Tracker beginning in October 1996. The 1996 lease provided, among other things, that Tracker would have á duty to keep the leased premises in good condition and to repair any damage done to the premises. Specifically, Paragraph 5 of the 1996 lease provided:
“5.' Tenant’s Duty to Repair:
“(a) Except as otherwise stated herein, during the Initial' Term and any Extended Term; [Tracker], at its own expense, shall' maintain the Premises in good condition and shall promptly make all necessary interior and exterior, ordinary as well as extraordinary, repairs to the pipes, heating :and air conditioning system; plumbing system, window glass, fixtures, and all other appliances and appurtenances, all equipment used in connection with, the Premises, and the sidewalks, curbs, and vaults adjoining or appurtenant to the Premises. Notwithstanding this duty to repair, [Tracker] shall not be responsible for replacement of the HVAC system in the event that such system cannot be reasonably repaired unless the need for replacement is a result of" [Tracker’s] unreasonable, extraordinary or improper use or acts or is a result of [Tracker’s] leasehold improvements. All repairs and replacements shall be at least equal to the original work in quality and class. [Oakley] shall make any necessary structural repairs and roof repairs during the Initial Term and any Extended Term, except for such repairs which are the result of [Tracker’s] unreasonable, extraordinary or improper use or acts. .[Oakley’s] duty to make .such repairs shall be limited to conditions about *516 which it receives notice from [Tracker], and [Oakley] shall have no duty to inspect the Premises to ascertain the existence of conditions requiring roof or structural repairs.
a • '
“(c) [Tracker], at its own expense, shall repair all damage or injury done to the Premises by [Tracker] or’ by any person who may be in or on the Premises, except [Oakley or its] agents, servants, and employees.”
Tracker and Oakley entered into a new lease in 2006. The 2006 lease contained Paragraphs 5(a) and (c) that were substantially similar , to the provisions quoted above.[3] The 2006 lease included two additional provisions, relating , to Tracker’s duties under the lease: Paragraphs 18 and 19.
Paragraph 18 is labeled “Environmental Compliance Indemnity,” and it states, in pertinent-part:’
“(a) By Tenant. [Tracker] warrants and agrees that it will not, during- the Initial Term or’ Extended Term(s), if any, of this Léase, knowingly or negligently allow or cause the presence, disposal, release or threatened release of any Hazardous Materials on,' from or undér the Premises, nor in the construction of the improvements or any alterations. Furthermore, [Tracker] covenants that it will comply with all federal, state and local laws regulating the creation, maintenance, storage, transportation and disposal of Hazardous Materials. [Tracker] hereby agrees to indemnify and hold harmless [Oakley], its directors, officers, shareholders, partners, trustees, employees and agents, and any successors to [Oakley’s] interest in the chain of title to the Premises, their directors, officers, shareholders, partners, trustees, employees and agents, from and against any and all losses, claims, damages, penalties, liabilities, response costs and expenses (including all out-of-pocket litigation costs and the reasonable fees and expenses of counsel) arising in connection with- the presence, ..use, generation, storage, release, - threatened release, disposal or transport of any Hazardous Materials , on, under, from or about the Premises by [Tracker], including, without limitation, (i) all foreseeable and unforeseeable consequential damages directly or indirectly arising out of the presence, use, generation, storage, release, threatened release, disposal or transport of Hazardous Materials by [Tracker] on the .. Premises, and (ii) all costs of any required or necessary repair, clean-up or detoxification, and preparation of any closure or other required plans, to the full extent that such action is attributable, directly or indirectly, to the presence or .use,, generation, storage, release,. threatened release or disposal of Hazardous Materials by [Tracker] on the , Premises; provided, hqwever, .[Tracker’s] indemnification obligations .hereunder shall not apply to the extent any of the, foregoing results, from, .an act or omission of [Oakley].”
Paragraph 19, reads, in its entirety:
“19. ■ Compliance with Laws and .Regulations. During the Initial Term and the Extended Term, [Tracker], at its own expense, shall promptly comply with all laws and regulations of all federal, state and municipal governments and appropriate departments, commissions, *517 boards and offices thereof or any other body now or hereafter exercising similar functions, which may be applicable to the Premises, the fixtures and equipment therein, and any sidewalks and curbs adjoining the Premises. [Tracker] shall comply with the requirements of all policies of public liability, ñre and other types of insurance at any time in force with respect to the building and other improvements on the Premises.”
At trial, DeWayne Oakley argued that Tracker had failed to. maintain the premises in good condition or to repair damage to the premises as required by the 1996 and 2006 leases. He also complained that Tracker had violated paragraphs 18 and 19 of the 2006 lease. He relied chiefly on his own testimony regarding the condition of the premises in 1997, a 1996 Phase I environmental-survey report regarding the premises, and the expert testimony of John Simmons, a professional engineer.
DeWayne testified that in 1997 he had dug up the asphalt parking area behind the business’s shop .at Tracker’s request. He then replaced the asphalt with concrete. While he was replacing the asphalt, DeWayne testified, he also performed grading work in the area behind the concrete pad, in which was -situated a retention pond. DeWayne was adamant that, at the time he dug up the asphalt and performed. the grading at the retention pond, the soil was not stained and did not have any odor indicating that it contained petroleum products. DeWayne testified that, when Oakley had operated, the business, he had properly disposed of the oil and gasoline involved in the business. He said that, when Oakley had operated the business, there were some 56-gallon drums and a 250-gallon tank into which the used oil and gasoline was placed and that a disposal company regularly came and drained the tank and drums.
DeWayne also said that he had visited the business after he leased the premises to Tracker and that he had observed a Tracker employee pouring oil or gasoline down the drain in the shop floor. The shop drain drained into .the retention pond. DeWayne also-testified that Tracker had asked if it could install a motor test pit on the premises in 1998. DeWayne said he gave Tracker permission to construct the motor test pit and that it was constructed behind the shop next to the retention pond.
The 1996 lease between Oakley and Tracker required that a Phase I environmental survey be performed on the- premises at the beginning of the lease term and again at the conclusion of the lease term. The initial Phase I survey was to serve as a baseline for determining, whether, at the conclusion of the lease, any environmental impact had resulted from Tracker’s use . of the premises. Around,the time the lease was executed in 1996, Oakley contacted Universal Testing, Inc., to have the 1996 Phase I survey performed. Tracker raised no issue with the 1996 Phase I report at the time it was completed.
Larry Lynn testified that he had supervised the performance of the 1996 Phase I survey. The 1996 Phase I survey was actually performed • by Doug Moomaw. The 1996 Phase I report contained in the record indicates that no evidence suggested the potential for site contamination.
When questioned about whether -the 1996 Phase I survey complied with -the standards applicable to. such surveys, Lynn admitted that the standards indicated that the engineer-performing a Phase I survey should walk through..any buildings on the premises and that the report should list the present and past uses of the premises; furthermore, Lynn admitted that the standards required the engineer performing a Phase I survey to:.note any storage of *518 petroleum products on the premises and to comment on storage conditions. However, the 1996 Phase I report did not indicate that Moomaw walked through the building on the premises, nor did the report mention the use of the premises as a boat dealership. In addition, the 1996 Phase I report did not indicate that a- 260-gallon fuel-storage tank or 55-gallon drums of waste fuel were located on the premises. According to Lynn, despite the standards, he would have noted only existing issues, not potential issues, in a Phase I report. Specifically, he commented that he would not have noted a drum of oil on the premises unless he had seen oil leaking from the drum.
As previously mentioned, Oakley entered into negotiations to sell the premises in 2008. The buyer, Bevis, had some'soil samples tested, and those samples indicated the presence of TPH in the soil. Based on the initial samples, Bevis contacted E. Roberts, Alley '& Associates, Inc., a local company that regularly performed environmental testing. Simmons, who was thén employed by E.' Roberts, Alley & Associates, Inc., testified that he had performed additional soil testing for Bevis. According to Simmons, the initial soil testing showed elevated levels of TPH, so Simmons suggested further testing behind the shop, near the motor test pit, and around the storm-water retention pond and the ditch into which it drained.
■ Through Simmons, Oakley introduced several photographs showing dark stains in the soil near the motor test pit, at the edge of the concrete parking pad, and around the retention pond. Although Simmons testified that not all the soil samples Simmons took tested at more than 100 parts per million (“ppm”) of TPH, he explained that several had, including samples taken from the area around the motor test pit, which contained 437 ppm of TPH. Certain areas under the concrete pad were also tested; Simmons said that small concentrations of TPH were detected under the concrete pad. Simmons testified that, when the soil was excavated, it was 'noticeably stained and had a noticeable petroleum odor.
Simmons admitted that the Alabama Department of Environmental Management (“ADEM”) does not consider TPH to be a hazardous substance. However, Simmons testified that ADEM considered material containing more than 100 ppm of TPH to be “special petroleum waste” and that ADEM could require clean up of such contamination. According to Simmons, he directed or “advised” the clean-up or remediation efforts at the premises, and, he said, Oakley had removed the soil only in the areas that tested at over 100 ppm of TPH. Simmons testified that TPH contamination could impact the value of real property and that the TPH contamination on the premises had, in his opinion, damaged the premises.
Simmons opined that, based on De-Wayne’s testimony that the áoil he dug up in 1997 was not stained and did not have a strong odor, the most-likely source of the contamination was the operation of the business by Tracker after 1997. Although he admitted that a layperson could not tell if soil contained objectionable levels of TPH just by viewing the soil, Simmons explained that at levels about 100 ppm TPH was usually visible as a dark stain in the soil. Simmons noted that his view of the contamination during the excavation process had indicated to him that much of the contamination had come from the motor test pit, which drained into the retention pond, indicating to him that the contamination must have occurred after the installation of the motor test pit in 1998. Simmons indicated that other contamination might have come from washing boats *519 in the'area behind the shop, parking boats with their bilge plugs open over the edge of the concrete parking pad, and winterizing boats, because oil and gasoline could have been washed off the concrete pad, or drained directly, onto the soil.
Simmons admitted that he could not date the contamination he discovered. He further admitted that the contamination may have been caused by the earlier owners of the business. When asked about the 250-gallon tank and the 55-gallon drums, Simmons said that he had not seen a tank or any drums on the premises. He acknowledged that the tank or the drums may well have caused the contamination, depending on their previous location on the premises. Simmons also admitted that, in 2008, ADEM had no regulations setting an “action limit” for TPH other than in the case of underground storage tanks. Furthermore, he agreed that ADEM had neither cited Oakley nor ordered that a clean up or remediation be performed. Simmons testified that he had notified ADEM of the contamination and had sought approval for the disposal of the contaminated soil.
In conjunction with his direction or “advising” of the remediation project, Simmons made several recommendations to prevent future TPH contamination on the premises. Among Simmons’s recommendations was to install “a ‘T-box’ at the .discharge pipe for the storm water retention area [to] further reduce the potential for movement of contaminants off-site.” Oakley accepted Simmons’s recommendation and installed the concrete T-box as it completed the remediation.
Tracker Marine’s main argument at'trial was that, although TPH was present in the soil, determining when or by whom the TPH was released was hot possible given the lack of clear evidence of the condition of the premises in 1996. In addition to presenting evidence indicating that the 1996 Phase I survey did not meet the ■standard's applicable to such surveys, Tracker Marine presented the deposition testimony of Suzan Gonder, a geologist and managing principal of Environmental Works, Inc., an environmental consulting company. She testified that she had had significant experience working with petroleum contamination and remediation.
Gonder explained that Alabama does not have a “clean up” standard for TPH unless an underground storage tank is involved. Instead, she said, Alabama has a voluntary cléan-up program, into which Oakley had not entered. According to Gonder, the removal of TPH on the premises was xiot necessary. She explained that, in her opinion, the amount of TPH was below regulatory standards, posed no risk to the environment, and “was in a commercial setting.” Gonder also opined that there was no way to tell where the TPH came from or when it was released onto the premises. She stated that determining the timing of the release was impossible because of the lack of a baseline indicating the operations of the business before 1996 and between Í996 and 2008. She noted that the presence of TPH under the concrete pad. indicated that TPH was probably present before the installation of the pad in 1997. Gonder commented that other possible contaminators existed, including run-off from the nearby highway and even the possibility .that the fill dirt used in a 1996 expansion and work on the retention pond was itself contaminated. Gonder did not dispute that the soil contained TPH; she said that she lacked sufficient .data to determine when the contamination occurred and, therefore, whether Tracker was responsible for the contamination.
Oh appeal, Tracker Marine first argues that Oakley failed to. prove that Tracker violated the “good condition” provisions of *520 Paragraph 5 of the 1996 and 2006 leases. Those leases required Tracker to “maintain the premises in good condition” and to, “at its own expense, ... repair all damage or injury done to the Premises” by it or another not affiliated with Oakley.
Although Oakley sought and was awarded damages under, a- breach-of-contract theory, Tracker Marine’s argument on appeal is- ■ based primarily on tort law. Tracker Marine argues that Oakley had to prove “causation,” that, is, that Oakley had to prove that Tracker’s activities on the premises, i.e., its “negligence,” caused the TPH contamination, i.e., the “injury.” See Martin v. Arnold, 643 So.2d 664, 567 (Ala.1994) (explaining that, to establish the proximate-cause element of a negligence claim, a “plaintiff, [must] prove that the defendant’s negligence caused the injury”). Tracker Marine contends that Oakley did not actually prove that TPH contamination in the soil resulted from actions taken by Tracker between 1996 and 2008. Instead, Tracker Marine complains, Oakley and the trial court relied on the temporal relationship' between Tracker’s operation of the business after Í997 and the discovery of the TPH contamination in 2008 to establish its liability, which, it says, is a classic logical fallacy: the post hoc ergo propter hoc fallacy.[4] Tracker Marine cites McClain v. Metabolife International, Inc., 401 F.3d 1233 (11th Cir.2005), and Cooper v. Marten Transport Ltd., 539 Fed.App’x 963 (11th Cir.2013) (not selected for publication in Federal Reporter), both of which discussed that fallacy in performing an evaluation of the admissibility of expert testimony under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
Tracker Marine complains on appeal that Oakley presented evidence indicating that TPH was found in the soil in 2008 and that Tracker had operated the business since 1996. What Oakley did not prove, Tracker Marine insists, was that Tracker actually released TPH, some of which had to have been on the premises before 1997, when the concrete pad was laid. Essentially, Tracker Marine attacks Simmons’s expert opinion as being based' on a logical fallacy. Tracker Marine did not, however, seek to preclude Simmons’s testimony as being unreliable under Daubert in the trial court.
Because Tracker Marine did not move to exclude Simmons’s expert testimony below, Tracker Marine’s argument is not sufficient to entitle it to reversal. That is, Simmons’s testimony, even assuming it is not reliable under Daubert, was admitted without objection, and the trial court was' entitled to rely on it without limitation.[5] See Ex parte Neal, 423 So.2d 850, 852 (Ala.1982) (“The trial court is not in error if inadmissible testimony comes in without objection and without a ruling thereon appearing in the record. The testimony is thus generally admissible and not limited as to weight or purpose.”). Tracker Marine overlooks that the trial court is “ ‘the sole judge of the facts and of the credibility of witnesses’ ” and that ‘“we'are required to review the evidence *521 in a light most favorable to the prevailing part[y].’ ” Architecture, Inc. v. Miller, 769 So.2d 330, 332 (Ala.Civ.App.2000) (quoting Driver v. Hice, 618 So.2d 129, 131 (Ala.Civ.App.1993)). The testimony and evidence presented to the trial court included the conflicting expert opinions of Simmons and Gonder regarding whether the TPH contamination resulted from activities' conducted by Tracker on the premises. De-Wayne’s testimony was that the soil he disturbed in 1997 was not stained and did not smell of petroleum. Although Simmons did state that a layman would not be able to determine the amount of TPH in the soil by looking at it, he stated that contamination at levels above 100 ppm, like the contamination near the motor test pit and retention pond, would be visible as stain in the soil. The trial court was free to believe DeWayne’s testimony that the area, surrounding the retention pond contained no such staining and to accept Simmons’s unchallenged[6] testimony that the most likely cause of the TPH. contamination was Tracker’s conduct of the business after 1997. Thus, the trial court had sufficient evidence to determine that a preponderance of the. evidence supported the conclusion that the TPH contamination resulted from activities occurring on the premises- after 1997. Further, the evidence adduced at trial supports a conclusion that TPH contamination can impact the value of real property, that the soil was .contaminated with TPH, < and, thus, that ,the premises were, damaged and not in “good condition.” ,. ,
Tracker Marine next argues that-the evidence failed to demonstrate that Tracker breached “any other” provision of the 2006 leas,e, i.e., Paragraphs 18 and 19. Paragraph 18 of the 2006 lease required Tracker to assume liability for the “costs of any required .or necessary repair, cleanup or detoxification and preparation of any closure or other required plans, to the full extent that such action is- attributable, directly or indirectly, to the presence or use, generation, storage, release, threatened release, or disposal of Hazardous. Materials by Tenant on the Premises.” Paragraph 19 of the 2006 lease required. Tracker to comply with all state and federal laws or regulations. Tracker Marine argues that Oakley did not prove (1) that TPH is a hazardous material, (2) that the levels of TPH in the soil violated any environmental statute or regulation, or (3) that remediation or clean up was required by any regulatory agency.
Paragraph 18 of the 2006 lease does not define the term “hazardous materials” or reference ’ any' particular statute or regulation defining that term. Although Gonder testified that petroleum is not a hazardous waste, she indicated that “part of [TPH] would be” a “hazardous material” under unspecified Department of Transportation regulations but not under other federal laws' or regulations. She explained that there are three separate terms used in various regulations: hazardous waste, hazardous substances, and hazardous materials. Gonder testified that TPH could be either a hazardous waste or a hazardous material; she also- said That gasoline could be hazardous waste as well. Gonder summed up her testimony on this point by stating: “It’s honestly very confusing to someone who doesn’t work in it all the time.” ‘
A lease is a contract, and we construe a lease like any other contract. See Horne v. TGM Assocs., L.P., 56 So.3d *522 615, 622 (Ala.2010). When the terms-used in a lease are. plain and unambiguous, the lease must be given effect as- written. Horne, 56 So.3d at 622. Because the term is not defined in the contract and it appears that there is no set definition of the term “hazardous materials” in the law, the term should be given its plain or ordinary meaning. See Bowdoin Square, L.L.C. v. Winn-Dixie Montgomery, Inc,, 873 So.2d 1091, 1098 (Ala.2003). “Hazardous” is defined as “involving or exposing one to risk (as of loss or harm).” Merriam-Webster’s Collegiate Dictionary 572 (11th ed.2003). “Material” is defined as “relating to, derived from, or consisting of matter.” Merriam-Webster’s Collegiate Dictionary 765 (11th ed.2003). Thus, if TPH is matter that could involve or expose one to risk of loss or harm, it could be considered a hazardous material under the lease. The plain meaning is therefore not helpful in determining whether TPH is, indeed, a hazardous material under the lease. However, in light of the lack of a specific definition of the term and the testimony presented to the trial court indicating that TPH is considered a hazardous material or a hazardous substance under some regulatory schemes, we cannot agree with Tracker Marine that the trial court could not have concluded that TPH qualifies as a hazardous material under the lease.
To the extent Tracker Marine argues that the trial court improperly concluded that. Oakley should recover the costs of the. remediation because, Tracker Marine contends, Oakley failed to show that remediation or clean up was required under some state or federal law or regulatory scheme, we note that Paragraph 18 of the 2006 lease does not require such proof. Although that paragraph requires Tracker to “comply with all federal, state and local laws regulating the creation, maintenance, storage, transportation and disposal of Hazardous Materials,” the portion of Paragraph 18 requiring Tracker to assume the cost of “repair, clean-up or detoxification” does not reference any federal, state, or local laws governing hazardous materials. Instead, that portion of Paragraph 18 refers. to “any required or necessary repair, clean-up or detoxification.” Thus, Oakley was not required to prove that the remediation was -required by any statutory or regulatory scheme, and the trial court was free to determine that Tracker Marine was liable to Oakley under Paragraph 18 for the costs of the remediation because the remediation was necessary.[7]
Because the trial court’s judgment is supported by evidence indicating that Tracker breached both Paragraph 18 of the 2006 lease and Paragraph 5 of the 1996 and the 2006 leases, we need not consider whether the evidence also supports a conclusion that Tracker also breached Paragraph 19 of the 2006 lease. See Favorite Market Store v. Waldrop, 924 So.2d 719, 723 (Ala.Civ.App.2005) (pretermitting discussion of additional issues when resolution of the decided issue was dispositive of the case). We note however, that it appears, based on the testimony of both Simmons and Gonder, that no federal or state law or regulation was violated by the release of TPH into the soil. Thus, the evidence does not appear ■ to ' support a conclusion that Tracker breached Paragraph 19 of the 2006 lease.
Finally, Tracker Marine argues that the trial court erred by including in its damages award the cost of a “concrete *523 box” installed by Oakley during the remediation, because, Tracker Marine contends, that item was an improvement to the premises and not part of any necessary clean up or remediation. Tracker Marine states in its brief on appeal that the proper element of damages in a breach-of-contract action is “that sum that would place the injured party ‘in ás good á position as [the plaintiff] would have been if [the défendant] had not broken the contract.’” Jenelle Mims Marsh, Alabama Law of Damages § 17.1 (6th ed.2012) (quoting Alabama Pattern Jury Instructions: Civil § 10:36 (2d ed.)). Allowing Oakley to receive as damages an amount spent to improve the premises, Tracker Marine argues, violates this precept and places Oakley in a better position than it would have been in if Tracker had performed its duty under the lease.
Although Tracker Marine attempted at trial to demonstrate that certain of Oakley’s actions during the Remediation process resulted in “improvement” to the premises, the trial court clearly rejected this contention. The lease requires “repair” of the premises, and “repair” is defined as “to restore to á sound or healthy state.” Merriam-Webster’s Collegiate Dictionary 1055 (11th ed.2003). Oakley argues on appeal, as it did at trial, that the amount Oakley spent remediating the TPH contamination was necessary and proper. Oakley maintained at trial that the installation of the T-box or other alleged “improvements” were, in fact, undertaken to prevent or reduce future contamination.
The trial court was free to conclude that repairs undertaken to restore the premises to a “healthy” state could include measures designed to prevent future contamination. In' addition, because the trial court relied on Tracker’s duty under Paragraph 18 of the 2006 lease, Tracker Marine was required to indemnify Oakley for the costs of “any required or necessary repair, cleanup or detoxification and preparation of any closure or other required plans....” Tracker Marine does not argue that the cost of “other required plans” would not include the cost of any steps to be taken to prevent future contamination. Thus, we conclude that the trial court was free to determine that the installation of the T-box was a necessary part of the remediation of the premises; we therefore affirm the award of $49,960.51 in damages to Oakley.
In conclusion, the testimony and evidence presented to the trial court supports the trial court’s determination that Tracker breached Paragraph 5 of the 1996 and 2006 leases and Paragraph 18 of the 2006 lease. The evidence further supports the trial court’s conclusion that the cost of the T-box was properly awarded as damages as part of Tracker’s duty to repair the premises and to assume the costs of “other required plans” resulting from Tracker’s release of hazardous materials onto the premises. Accordingly, we affirm the trial court’s judgment.
As authorized by Paragraph 18 of the 2006 lease, Oakley is awarded an attorney fee in the amount'of $15,264.
AFFIRMED.
THOMPSON, P.J., and PITTMAN and MOORE, JJ., concuiv
DONALDSON, J., concurs in the result, without writing.

. At trial, counsel for Tracker Marine stated that Tracker Marine had acquired the assets of Travis Boating Center, LLC, which had succeeded Travis Boating Center, Inc;, and Travis Boats and Motors, LLC.

. Oakley sued Tracker. However, as explained in note 1, supra, Tracker Marine had purchased the assets and liabilities of Travis Boating Center, LLC, and the only extant entity at the time of trial was Tracker Marine. Oaldey also named fictitious parties in its complaint. However, the record' does riot reflect that the complaint was amended to substitute any actual parties for the fictitiously named parties; no parties other than Tracker were served with the complaint.
"When there are multiple defendants and the summons (or other document to 'be served) and the complaint have been served on one or more, but not all, of the defendants, the plaintiff may proceed to judgment as to the defendant or defendants on whom process has been served and, if the judgment as to the defendant or defendants who have been served is final in all other respects, it shall be a final judgment,”
Rule 4(f), Ala. R. Civ. P, Thus, the existence of the fictitiously named parties in'Oakley's complaint does not prevent finality of the judgment entered by the trial court. See Griffin v. Prime Healthcare Corp., 3 So.3d 892 n. 1 (Ala.Civ.App.2008).

, Paragraph 5(a)' 'of the 2006 lease contained additional terms relating to the division of fhe cost of asphalting the parking lot. Those additional terms are not relevant to the issues in • -this appeal. 1

. In McClain v. Metabolife International, Inc., 401 F.3d 1233, 1243 (11th Cir.2005), the Eleventh Circuit Court of Appeals explained the fallacy thusly:
“The post hoc ergo propter hoc fallacy assumes causality from temporal sequence. It literally means ‘after this, because of this.’ Black’s Law Dictionary 1186 (7th ed.1999). It is called a fallacy because it makes an assumption based on the false inference that a temporal relationship proves a causal relationship."

. We caution that we have not evaluated Simmons's testimony under Daubert and that we are not stating an opinion on its reliability under the Daubert standard.

. • Simmons's testimony was unchallenged in the sense that Tracker did not seek to have Simmons's expert testimony,stricken because of ils allegedly unreliable basis. Tracker Marine.pross-examined Simmons .thoroughly and presented conflicting expert testimony.

. We note that Tracker Marine does not specifically argue in its appellate brief that the evidence does not support a conclusion that the remediation was necessary. We therefore do not address that potential issue. See Tucker v. Cullman-Jefferson Cntys. Gas Dist., 864 So.2d 317, 319 (Ala.2003) (stating that issues not raised and argued in brief are waived).